## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CONSCIOUS CONTENT MEDIA, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 25-12231 (BLS)<br><br>(Jointly Administered) |

### COMBINED DISCLOSURE STATEMENT AND
### JOINT CHAPTER 11 PLAN OF REORGANIZATION

**REITLER KAILAS & ROSENBLATT LLP**
Lauren Friend McKelvey (admitted *pro hac vice*)
David N. Tabakin (admitted *pro hac vice*)
885 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 209-3037
Email: lmckelvey@reitlerlaw.com
　　　dtabakin@reitlerlaw.com

*Co-Counsel for the Debtors*

**BAYARD, P.A.**
Daniel N. Brogan (No. 5723)
Steven D. Adler (No. 6257)
Ashly L. Riches (No. 7256)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email:　dbrogan@bayardlaw.com
　　　　sadler@bayardlaw.com
　　　　ariches@bayardlaw.com

*Co-Counsel for the Debtors*

Dated:  December 23, 2025

---

[1] The address of the Debtors is 121 Varick Street, 3rd Floor, New York, NY 10013.  The last four digits of the Debtors' federal tax indemnification numbers are: (i) Conscious Content Media, Inc. (5587); (ii) KidPass, Inc. (8021); (iii) CodeSpark, Inc. (7664); (iv) Little Passports, Inc. (2880); and (v) CCM Merger Sub II, Inc.

## <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ....................................4

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .......................................................19

2.1    **ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS** .................19

2.2    **PROFESSIONAL FEE CLAIMS**...................................................................20

2.3    **DIP CLAIMS**.................................................................................................21

2.4    **RESTRUCTURING EXPENSES**..................................................................21

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED
RECOVERIES ......................................................................................................22

3.1    **GENERAL RULES OF CLASSIFICATION** ..............................................22

3.2    **SUMMARY OF CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND INTERESTS.** .................................................23

3.3    **CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS.** ........................................................................................24

3.4    **SPECIAL PROVISIONS REGARDING UNIMPAIRED CLAIMS.** .............28

3.5    **SUBORDINATED CLAIMS.** .......................................................................28

ARTICLE IV BACKGROUND AND DISCLOSURES.............................................................29

4.1    **GENERAL BACKGROUND.** ......................................................................29

4.2    **EVENTS LEADING TO CHAPTER 11.** ......................................................37

4.3    **THE CHAPTER 11 CASES.**.........................................................................38

ARTICLE V CONFIRMATION AND VOTING PROCEDURES ............................................41

5.1    **CONFIRMATION PROCEDURE**................................................................41

5.2    **PROCEDURE FOR OBJECTIONS**.............................................................41

5.3    **REQUIREMENTS FOR CONFIRMATION**................................................42

5.4    **CLASSIFICATION OF CLAIMS AND INTERESTS.** .................................42

5.5    **IMPAIRED CLAIMS OR INTERESTS.** ......................................................43

5.6    **CONFIRMATION WITHOUT NECESSARY ACCEPTANCES**.................44

5.7    **BEST INTERESTS TEST AND LIQUIDATION ANALYSIS.** ......................45

5.8    **VALUATION** ...............................................................................................46

5.9    **FINANCIAL FEASIBILITY** .......................................................................46

5.10   **RELEASES & EXCULPATIONS** ................................................................47

5.11   **ACCEPTANCE OF THE PLAN**..................................................................47

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING........48

6.1 **THE PLAN MAY NOT BE ACCEPTED**.........................................................48

6.2 **THE PLAN MAY NOT BE CONFIRMED**......................................................48

6.3 **FAILURE TO RECEIVE BANKRUPTCY COURT APPROVAL OF THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN.**...................................................................................48

6.4 **DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS.**...............49

6.5 **OBJECTIONS TO CLASSIFICATION OF CLAIMS.**....................................49

6.6 **FAILURE TO CONSUMMATE THE PLAN**...................................................50

6.7 **EXTENDED STAY IN THE CHAPTER 11 CASES.**.....................................50

6.8 **TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT IN CERTAIN CIRCUMSTANCES.**......................................51

6.9 **ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER THE PLAN.**.......................................................................................................51

6.10 **CERTAIN TAX CONSIDERATIONS.**...........................................................51

6.11 **RISKS ASSOCIATED WITH THE DEBTORS' BUSINESS.**........................52

ARTICLE VII MEANS OF IMPLEMENTING THE PLAN .........................................................52

7.1 **CORPORATE AND ORGANIZATIONAL EXISTENCE.**.............................53

7.2 **CORPORATE ACTION; RESTRUCTURING TRANSACTIONS**..............53

7.3 **ORGANIZATIONAL DOCUMENTS OF THE REORGANIZED DEBTORS.**...................................................................................................54

7.4 **MANAGERS, DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS; CORPORATE GOVERNANCE**.....................................................54

7.5 **NEW NOTES ELECTION.**.............................................................................55

7.6 **RESTRUCTURED NOTES DOCUMENTS; NEW CONVERTIBLE NOTES.**............................................................................................................55

7.7 **NEW EQUITY.**................................................................................................55

7.8 **EXEMPTION FROM REGISTRATION REQUIREMENTS**........................55

7.9 **MANAGEMENT INCENTIVE PLAN.**..........................................................57

7.10 **EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS.**.............57

7.11 **VESTING OF ASSETS IN THE REORGANIZED DEBTORS**...................57

7.12 **RELEASE OF LIENS, CLAIMS, AND EXISTING EQUITY INTERESTS.**..................................................................................................57

7.13 **CANCELLATION OF STOCK, CERTIFICATES, INSTRUMENTS AND AGREEMENTS.**........................................................................................58

7.14 **PRESERVATION AND MAINTENANCE OF DEBTORS' CAUSES OF ACTION.**................................................................................58

7.15 **EXEMPTION FROM CERTAIN TRANSFER TAXES.** ...............................59

7.16 **CERTAIN TAX MATTERS.**........................................................................59

7.17 **DISTRIBUTIONS.**.........................................................................................60

7.18 **CREDITORS' COMMITTEE**........................................................................60

7.19 **CLOSING THE CHAPTER 11 CASES** ........................................................60

ARTICLE VIII EFFECTS OF CONFIRMATION .....................................................60

8.1 **BINDING EFFECT.**.......................................................................................60

8.2 **DISCHARGE OF CLAIMS AND TERMINATION OF EXISTING EQUITY INTERESTS; COMPROMISE AND SETTLEMENT OF CLAIMS, EXISTING EQUITY INTERESTS, AND CONTROVERSIES.**......................................................................................60

8.3 **RELEASES BY THE DEBTORS.** .................................................................61

8.4 **THIRD PARTY RELEASE.** ...........................................................................63

8.5 **EXCULPATION.** ............................................................................................64

8.6 **INJUNCTION.** ...............................................................................................65

8.7 **SETOFFS AND RECOUPMENT.** .................................................................66

8.8 **COMPROMISE, SETTLEMENT, AND RELEASE OF CLAIMS AND INTERESTS** ..........................................................................................67

8.9 **RELEASE OF LIENS** ....................................................................................67

8.10 **NO LIABILITY PURSUANT TO SECTION 1125(E) OF THE BANKRUPTCY CODE** ..................................................................................68

8.11 **TERMS OF INJUNCTIONS OR STAYS** .....................................................68

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............................68

9.1 **DEBTORS ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** ..................................................................................68

9.2 68

9.3 **CURE OF DEFAULTS FOR ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**..............................................69

9.4 **ASSUMPTION OF INSURANCE POLICIES.** ..............................................70

9.5 **INDEMNIFICATION.** ....................................................................................70

9.6 **SEVERANCE AGREEMENTS AND COMPENSATION AND BENEFIT PROGRAMS; EMPLOYMENT AGREEMENTS.** .......................71

9.7 **WORKERS' COMPENSATION BENEFITS.** ................................................71

9.8 **RESERVATION OF RIGHTS.** .......................................................................71

ARTICLE X DISTRIBUTIONS..................................................................................71

10.1 **DISTRIBUTIONS FOR CLAIMS ALLOWED AS OF THE EFFECTIVE DATE**................................................................71

10.2 **NO DISTRIBUTIONS ON DISPUTED CLAIMS** ........................72

10.3 **DISTRIBUTIONS ON CLAIMS ALLOWED AFTER THE EFFECTIVE DATE**................................................................72

10.4 **OBJECTIONS TO AND ESTIMATION OF CLAIMS**....................72

10.5 **ELECTION PROCEDURES FOR HOLDERS OF GENERAL UNSECURED CLAIMS**....................................................72

10.6 **DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**.........................................73

10.7 **INTEREST ON CLAIMS** ....................................................73

10.8 **WITHHOLDING AND REPORTING REQUIREMENTS** ..............74

10.9 **MISCELLANEOUS DISTRIBUTION PROVISIONS.**....................74

10.10 *DE MINIMIS DISTRIBUTION PROVISIONS* ..................................75

10.11 **DISTRIBUTION RECORD DATE**........................................75

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .............75

11.1 **CONDITIONS TO EFFECTIVE DATE** .................................75

11.2 **SUBSTANTIAL CONSUMMATION**......................................76

11.3 **CONSEQUENCES OF NON-OCCURRENCE OF EFFECTIVE DATE** .........................................................................76

ARTICLE XII ADMINISTRATIVE PROVISIONS .......................................................76

12.1 **RETENTION OF JURISDICTION**........................................76

12.2 **PRESERVATION OF EXCLUSIVITY** ....................................78

12.3 **AMENDMENTS.** ...............................................................78

12.4 **WITHDRAWAL OF PLAN**.................................................79

12.5 **SUCCESSORS AND ASSIGNS** ............................................79

12.6 **GOVERNING LAW** ..........................................................79

12.7 **CORPORATE ACTION** .....................................................79

12.8 **EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS**...............................................................79

12.9 **CONFIRMATION ORDER AND PLAN CONTROL**...................79

12.10 **NOTICES.**.......................................................................79

12.11 **NO ADMISSIONS OR WAIVER** .........................................80

ARTICLE XIII RECOMMENDATION AND CONCLUSION ...................................................81

**EXHIBIT A**   **New Convertible Note Term Sheet**
**EXHIBIT B**   **Liquidation Analysis**
**EXHIBIT C**   **Valuation Analysis**
**EXHIBIT D**   **Financial Projections**
**EXHIBIT E**   **Restructuring Support Agreement**

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PROPONENT, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTEMPLATES THE REORGANIZATION OF THE DEBTORS AND DISTRIBUTIONS TO CREDITORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS, OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DEBTORS' SCHEDULES. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND THEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2.

## <u>Special Notice Regarding Federal and State Securities Laws</u>

**This Combined Disclosure Statement and Plan and the securities issued pursuant to the Plan have not been approved or disapproved by the Securities and Exchange Commission (the "<u>SEC</u>") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Combined Disclosure Statement and Plan or upon the merits of the Plan. Any representation to the contrary is a criminal offense.**

**The Debtors will rely on: (i) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws any offer and the issuance and distribution of New Equity under the Plan and (ii) New  under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance and distribution of the New Equity and New Convertible Notes under the Plan. Any and all New Equity and New Convertible Notes offered, issued, or distributed under the Plan pursuant to section 4(a)(2) of the Securities Act shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws (including Blue Sky Laws).**

**This Combined Disclosure Statement and Plan does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized. This Combined Disclosure Statement and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Rule 3017-2. Dissemination of this Combined Disclosure Statement and Plan is controlled by Bankruptcy Rule 3017. This Combined Disclosure Statement and Plan was prepared to provide parties in interest in the Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.**

**Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended Plan and related disclosure statement from time to time, subject to the terms of the Plan. The effectiveness of the Plan is subject to several conditions precedent. There is no assurance that these conditions will be satisfied or waived. No person has been authorized by the Debtors in connection with the Plan or the solicitation thereof to give any information or to make any representation other than as contained in this Combined Disclosure Statement and Plan and the Exhibits, notices and schedules attached to or incorporated by reference or referred to in this Combined Disclosure Statement and Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.**

**Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles. The Financial Projections, while**

presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

This Combined Disclosure Statement and Plan includes "forward-looking statements," all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent  uncertainties. When used in this Disclosure Statement, the words "may," "will," "could," "expect," "anticipate," "believe," "estimate," "plan," "intend," "aim" and similar expressions generally identify forward-looking statements. The Debtors have based these forward-looking statements on their current views with respect to future events and financial performance. Actual results could differ materially from those projected in the forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to known and unknown risks, uncertainties, and other factors that could cause actual results and performance to differ materially from any future results or performance contemplated by a forward-looking statement, including under the heading "Risk Factors" below. Accordingly, the Debtors cannot give any assurance that their expectations will in fact occur and caution that actual results may differ materially from those in the forward- looking statements. All forward-looking statements attributable to the Debtors or persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Combined Disclosure Statement and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to revise or update any forward-looking statement, or to make any other forward- looking statements, whether as a result of new information, future events, or otherwise.

## INTRODUCTION

Conscious Content Media, Inc., and each of the other above-captioned Debtors[2] hereby propose this Plan for, among other things, the resolution of the outstanding Claims against, Existing Equity Interests in, the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, business, assets, events leading up to these Chapter 11 Cases, treatment under the Plan, risk factors, projections, and certain other

---

[2] Unless otherwise noted, capitalized terms used in this Combined Disclosure Statement and Plan have the meanings set forth in Article I hereof.

related matters. The Debtors urge all Holders of Claims entitled to vote on the Plan to review this Combined Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There may be other agreements and documents that will be filed with the Bankruptcy Court that are referenced in the Plan and the Plan Supplement as Exhibits. All such Exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the Restructuring Support Agreement and the Plan, and the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to amend, supplement, amend and restate, modify, revoke or withdraw the Plan prior to the Effective Date.

The Debtors will request that the Chapter 11 Cases be consolidated for procedural purposes only and the Debtors be jointly administered pursuant to an order of the Bankruptcy Court for administrative purposes and voting. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each Debtor, including for purposes of distribution. Each Debtor reserves the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class.

During the Chapter 11 Cases, the Debtors intend to operate their businesses in the ordinary course. Importantly, the Plan implements the Restructuring Transactions with every Secured creditor in these Chapter 11 Cases.  The Debtors will continue to try to build consensus with other stakeholders after solicitation launch and before the Confirmation Hearing. ***The Debtors urge you to vote to accept the Plan***.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1    "**1125(e) Parties**" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Consenting Secured Noteholders; and (c) with respect to each of the foregoing Entities in clauses (a) through (b), the Related Parties of such Entities.

1.2    "**2023 Bridge Notes**" means those certain bridge notes issued by CCM to the 2023 Bridge Noteholders between March 28, 2023 through May 26, 2023 in the aggregate original principal amount of $10.0.

1.3    "**2023 Bridge Noteholders**" means DKH Capital LLC, Ascot Capital LLC, Tipsy Ventures Ltd., A.T.A. Ventures I Corp. Ltd and Devdend LLC

1.4    "**2023 Bridge Secured Claims**" means the Claims held by the 2023 Bridge Noteholders on account of the 2023 Bridge Notes.

1.5    "**Administrative Claim**" means an unsecured Claim for payment of costs or expenses of administration specified in Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Debtors' estates and operating the business of the Debtors; and (b) Professional Fee Claims.

1.6    "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be the date that is thirty (30) days after the Effective Date.

1.7    "**Affiliate**" means "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.8    "**Agents**" means, together, the Magnetar Collateral Agent and the 2023 Bridge Collateral Agent.

1.9    "**Allowed**" means with respect to any Claim, except as otherwise provided in the Plan:  a Claim that is: (a)  either (i) scheduled by the Debtors in their Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined, or disputed; or (ii) asserted in these Chapter 11 Cases by a proof of claim which has been timely filed, or deemed timely filed, with the Claims Agent in accordance with the procedures set forth in the Bar Date Order or late filed with leave of the Bankruptcy Court; and (b) either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a final order or pursuant to the Plan. An Allowed Claim: (x) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires, and (y) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of the Plan. For the avoidance of doubt:  (aa) any Claim that is withdrawn shall not be an Allowed Claim; (bb) any proof of claim filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (cc) except as otherwise specified in the Plan or any Final Order, and except for any Allowed Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date; and (dd) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

1.10    "**Amended Schedules Bar Date**" shall have the meaning ascribed to it in Section 4.3(e)(iii) herein.

1.11    "**Avoidance Actions**" means any and all avoidance, recovery or subordination claims and causes of action, whether actual or potential, to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.12    "**Ballot**" means the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan.

1.13    "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended.

1.14    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.15    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Rules.

1.16    "**Bar Date**" means, with respect to any particular Claim, the specific date set forth in the Bar Date Order or in this Plan as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest against the Debtors in these Chapter 11 Cases for that specific Claim.

1.17    "**Bar Date Order**" means that certain *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* (D.I. [___]), entered by the Bankruptcy Court on January [___], 2026.

1.18    "**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.19    "**Cash**" means legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.20    "**Causes of Action**" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. "Cause of Action" also includes: (i) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (ii) with respect to the Debtors, the right to object to Claims or Existing Equity Interests; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Action.

1.21    "**CCM**" Conscious Content Media, Inc.

1.22    "**CEO**" means Neal Shenoy, the chief executive officer of CCM.

1.23    "**Chapter 11 Cases**" means these Chapter 11 Cases commenced by the Debtors and jointly administered under case number 25-12231 (BLS) in the Bankruptcy Court.

1.24    "**Claim**" means a claim, as such term is defined in Bankruptcy Code section 101(5), against any of the Debtors.

1.25    "**Claims Agent**" means the Debtors' claims, noticing and solicitation agent, Stretto, Inc.

1.26    "**Class**" means a group of Claims or Interests described in Article III of this Plan.

1.27    "**Combined Disclosure Statement and Plan**" means this combined disclosure statement and chapter 11 plan, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

1.28    "**Common Stock**" means the common stock of CCM.

1.29    "**Committee**" means a statutory committee appointed in the Chapter 11 Cases.

1.30    "**Conditional Approval and Procedures Order**" means the [__] (D.I. [__]).

1.31    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.32    "**Confirmation Hearing**" means the first hearing held by the Bankruptcy Court to consider confirmation of the Plan.

1.33    "**Confirmation Order**" means an order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.34    "**Consenting Secured Noteholders**" means the Magnetar Noteholders, the 2023 Bridge Noteholders, the Mezzanine Noteholders, and the Secured Convertible Noteholders.

1.35    "**Consenting Noteholder Claims**" mean Magnetar Note Claims, the 2023 Bridge Claims, the Mezzanine Note Claims, and the Secured Convertible Claims.

1.36    "**Consummation**" means the occurrence of the Effective Date.

1.37    "**D&O Liability Insurance Policies**" means any insurance policy for, among others, directors, members, trustees and officers' liability (or any equivalents) maintained by the Debtors' Estates, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.38    "**Debtors**" means each of Conscious Content Media, Inc., KidPass, Inc., CodeSpark, Inc., Little Passports, Inc, and CCM Merger Sub II, Inc.

1.39    "**Debtor Release**" has the meaning set forth in Section 12.2 of this Plan

1.40    "**Debtor Releasing Party**" means any Releasing Party that is a Debtor.

1.41    "**DIP Agent**" means the administrative and collateral agent for the DIP Lenders with respect to the DIP Facility, which shall be either (a) [212]MEDIA LLC or (b) another Person selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders.

1.42    "**DIP Bridge Loan**" has the meaning given to it in Section 4.1(b)(v).

1.43    "**DIP Claims**" means, collectively, all Claims of the DIP Agent and/or the DIP Lenders related to, arising under, or in connection with the Interim DIP Order, the Final DIP Order and the DIP Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Agreement), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Credit Agreement.

1.44    "**DIP Credit Agreement**" means the Senior Secured Super-Priority Priming Term Loan Debtor-in-Possession Credit Agreement, dated as of December [___], 2025, by and among the Debtors and the DIP Lenders, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof (and including any and all documents and instruments executed in connection therewith).

1.45    "**DIP Documents**" means collectively, the DIP Motion, the DIP Orders, the DIP Credit Agreement, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.46    "**DIP Facility**" means the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Credit Agreement.

1.47    "**DIP Lenders**" means, collectively, and as of the relevant time, those lenders that are party to the DIP Credit Agreement

1.48    "**DIP Orders**" means the Interim DIP Order [and the Final DIP Order], including any exhibits and annexes attached thereto, entered by the Bankruptcy Court approving, among other things, the Debtors' use of cash collateral and parties' rights with respect thereto.

1.49    "**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law or by a Final Order.

1.50    "**Disclosure Statement**" means the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rule 3017-1, and other applicable law.

1.51    "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

1.52    "**Distribution**" means payment or distribution of consideration to Holders of Allowed Claims pursuant to this Plan in respect of the Holder's Allowed Claim.

1.53    "**Distribution Agent**" means an entity selected to make Distributions at the direction of the Reorganized Debtors, which may include the Claims Agent or the Reorganized Debtors.

1.54    "**Distribution Address**" means the address set forth in (a) the Proof of Claim filed by the Holder, (b) any written notice of address change delivered to the Debtors after the date of filing of any related Proof of Claim, (c) the Schedules, if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address, (d) the other records of the Debtors at the time of the Distribution if no Proof of Claim has been filed, the Debtors have not received a written notice of a change of address, and the Schedules do not include an address, or (e) any change of address as reflected on the Bankruptcy Court docket.

1.55    "**Distribution Date**" means the date when Distributions shall be made under the Plan.

1.56    "**Distribution Record Date**" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

1.57    "**Effective Date**" means the first date on which all of the conditions of Section 11.1 of the Plan have been satisfied or have been waived in writing and the Debtors declare the Plan effective.  For the avoidance of doubt, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.58    "**Election Form**" has the meaning given to it in Section 10.5.

1.59    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.60    "**Estate**" means the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases on the Petition Date and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

1.61    "**Estimation Order**" means an order or orders of the Bankruptcy Court estimating for voting and/or Distribution purposes (under section 502(c) of the Bankruptcy Code)

the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class. The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.62    "**Exhibit**" means an exhibit annexed to either the Plan or the Plan Supplement or as an exhibit or appendix to this Combined Disclosure Statement and Plan (as such exhibits may be amended, supplemented, amended and restated, or otherwise modified from time to time).

1.63    "**Existing Equity Interests**" means all Interests in CCM outstanding as of the Petition Date, including any restricted stock units, performance stock units or options issued pursuant to a pre-petition employee incentive or other similar plan of CCM, which such restricted stock units, performance stock units and options shall be deemed fully vested (at target with respect to performance stock units) and shall settle on the Effective Date.

1.64    "**Exit Financing**" means up to $20 million in financing (inclusive of up to $10 million of the DIP Facility rolled into the Exit Financing) funded to the Reorganized CCM in exchange for New Preferred Equity (Series A).

1.65    "**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; and (iii) each Related Party of each Entity in clause (i) and (ii), provided that "Exculpated Parties" shall not include Holders of Existing Equity Interests.

1.66    "**Executory Contract**" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.67    "**Face Amount**" means (a) with respect to any Claim for which a proof of claim is filed, an amount equal to: (i) the liquidated amount, if any, set forth therein, or (ii) any other amount set forth in an Estimation Order; or (b) with respect to any Claim scheduled in the relevant Debtor's Schedules, but for which no proof of claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent, and liquidated.

1.68    "**File**," "**Filed**," or "**Filing**" means, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

1.69    "**Final DIP Order**" means the [__] (D.I. [__]).

1.70    "**Final Order**" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review, rehearing, or to file a petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand, or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided*, *however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the

Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.71    "**First Day Declarations**" means the Shenoy Declaration and the Jain Declaration.

1.72    "**General Unsecured Claim**" means a Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Secured Claim, (d) an Other Priority Claim, (e) a Consenting Secured  Noteholder Claim, (f) Post-Closing Claim, or (g) an Interest.

1.73    "**General Bar Date**" shall have the meaning ascribed to it in Section 4.3(e)(iii) herein.

1.74    "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.75    "**Governmental Bar Date**" shall have the meaning ascribed to it in Section 4.3(e)(iii) herein.

1.76    "**Holder**" or "**Holders**" means a Person or an Entity holding a Claim or Interest.

1.77    "**Impaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.78    "**Impaired Class**" means a Class of Claims or Interests that is Impaired.

1.79    "**Indemnification Agreement**" means any organizational or employment and/or service document or agreement of or with the Debtors and currently in place that provides for the indemnification of any current or former director, officer, agent or employee of the Debtors with respect to all present and future actions, suits and proceedings against the Debtors or such directors, officers, agents or employees based upon any act or omission for or on behalf of the Debtors.

1.80    "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.81    "**Intercompany Claims**" means any Claim held by a Debtor against another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

1.82    "**Intercompany Interests**" means any Interest held by a Debtor against another Debtor.

1.83    "**Interest**" means an equity security, within the meaning of section 101(16) of the Bankruptcy Code.

1.84    "**Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Modifying the Automatic Stay; (IV) Authorizing Use of Cash Collateral; (V) Granting Adequate Protection; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (D.I. 34).

1.85    "**Jain Declaration**" means the *Declaration of Suraj Jain in Support of the Motion of the Debtor[s] for Interim and Final Orders: (I) Authorizing the Debtors[s] to Obtain Postpetition Financing; (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Modifying the Automatic Stay; (IV) Authorizing Use of Cash Collateral; (V) Granting Adequate Protection; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (D.I. 14).

1.86    "**Lien**" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.87    "**Liquidation Analysis**" means the liquidation analysis attached as **Exhibit B**.

1.88    "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware as now in effect or hereafter amended.

1.89    "**Magnetar Notes**" means those certain notes issued pursuant to the Note Issuance Agreement dated as of November 5, 2021 (as amended, supplemented or otherwise modified prior to the date hereof) by and among CCM, the guarantors party thereto, Magnetar Financial LLC in its capacity as representative of the holders thereunder, and U.S. Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association, in its capacity as collateral agent for the holders thereunder.

1.90    "**Magnetar Noteholders**" means the holders of the Magnetar Notes.

1.91    "**Magnetar Secured Claims**" means the Claims held by the Magnetar Noteholders on account of the Magnetar Notes.

1.92    "**Marketing LOC**" shall have the meaning given to it in Section 4.1(b)(vii).

1.93    "**Mezzanine Notes**" means that certain secured promissory note from CCM to Marbruck Investments Limited.

1.94    "**Mezzanine Noteholder**" means the holder of the Mezzanine Notes.

1.95    "**Mezzanine Secured Claims**" means the Claims held by the Mezzanine Noteholders on account of the Mezzanine Notes.

1.96    "**MIP**" means a management incentive plan, providing for the issuance of equity or equity-based awards equal to up to 6,520,000 shares of the New Common Equity (equivalent to approximately 20% of the New Common Equity), with the form of the awards (i.e., options, restricted stock or units, appreciation rights, etc.), the participants in the MIP, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) to be allocated by the CEO, subject to approval of the New Board.

1.97    "**New Board**" means the initial board of directors (or similar governing body) of Reorganized CCM as selected in accordance with the New Organizational Documents and as disclosed in the Plan Supplement.

1.98    "**New Common Equity**" means the common shares of Reorganized CCM to be authorized, issued and outstanding on and after the Effective Date.

1.99    "**New Convertible Note**" means a promissory note convertible into New Preferred Equity of the Reorganized CCM having the terms stated in the New Convertible Note Term Sheet attached as **Exhibit A.**

1.100    "**New Equity**" means New Common Equity and New Preferred Equity (including New Preferred Equity (Series A)).

1.101    "**New Notes Certification**" has the meaning given to it in Section 7.5.

1.102    "**New Notes Creditor**" means a Person that is: (i) a Holder of (x) a Post-Closing Claim that is Allowed or (y) a General Unsecured Claim that is Allowed and that has made the New Notes Election; and (ii) receives New Convertible Notes.

1.103    "**New Notes Election**" has the meaning given to it in Section 7.5.

1.104    "**New Organizational Documents**" means the new organizational documents of the Reorganized Debtors, to be entered into on the Effective Date, including certificates or incorporation, limited liability company agreements, operating agreement, equity subscription or purchase agreement, charters or by-law, the form of which shall be filed with the Plan Supplement.

1.105    "**New Preferred Equity**" means the preferred shares of Reorganized CCM to be authorized, issued and outstanding on and after the Effective Date.

1.106    "**New Preferred Equity (Series A)**" means New Preferred Equity issued on the following terms: (i) $8,500,000 pre-money valuation; (ii) 8% dividend; (iii) 1.0x liquidation preference; and (iv) standard NVCA terms.

1.107    "**New Warrants**" means warrants for New Common Equity.

1.108    "**Non-Debtor Releasing Party**" means any Releasing Party that is not a Debtor.

1.109   "**Objection(s)**" means any objection, application, motion, complaint, or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

1.110   "**Other Priority Claim**" means any Claim entitled to priority under sections 503(b) or 507(a)(2) of the Bankruptcy Code that is not a Priority Tax Claim.

1.111   "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

1.112   "**Petition Date**" means December 17, 2025, the date on which the Debtors commenced their Chapter 11 Cases in the Bankruptcy Court.

1.113   "**Plan**" means this joint plan under chapter 11 of the Bankruptcy Code, together with any amendments or modifications hereto as the Debtors may file hereafter in accordance with the terms of this Plan.

1.114   "**Plan Documents**" means the documents, including this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

1.115   "**Plan Supplement**" means the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the New Organizational Documents, the New Convertible Notes, the identity of the members of the New Board, and any other schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.116   "**Preferred Stock**" means the preferred stock of CCM.

1.117   "**Priority Tax Claim**" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.118   "**Pro Rata**" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

1.119   "**Professional**" means any professional Person or Entity employed in these Chapter 11 Cases by Court order pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

1.120   "**Professional Fee Claim**" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with these chapter 11 cases.

1.121   "**Professional Fee Claims Estimate**" means (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Professional Fee Claims through the Effective Date, to be provided by each Professional in writing to the Debtors, not less than five days prior to the Effective Date, and (ii) with respect to all of the Professionals, collectively, the sum of all individual Professional Fee Claims Estimates.

1.122   "**Professional Fee Escrow Account**" means an escrow account to hold an amount of Cash equal to the Professional Fee Claims Estimate funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.

1.123   "**Proof of Claim**" means a proof of claim filed against any Debtor in these Chapter 11 Cases.

1.124   "**Reinstated**" means, with respect to any Claim or Interest, the treatment provided for in section 1124 of the Bankruptcy Code. "**Reinstatement**" shall have a corollary meaning.

1.125   "**Rejection Damages Bar Date**" shall have the meaning ascribed to it in Section 4.3(e)(iii) herein.

1.126   "**Related Parties**" means, collectively, with respect to any Entity or Person, including each Released Party and Exculpated Party, such Entity or Person's, current, former and future Affiliates, member firms and associated entities, and with respect to each of the foregoing, their Affiliates, current and former directors, current and former managers, current and former officers, current and former equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, trustees, advisory board members, investment fund advisors or managers, investment managers, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

1.127   "**Released Party**" means, collectively each of, and in each case in its capacity as such: (i) each Debtor; (ii) each Reorganized Debtor; (iii) each Agent; (iv) the Consenting Secured Noteholders; (v) all Holders of Claims and Interests that elect to opt in to the third party releases set forth in Article VIII hereof and (vi) each Related Party of each Entity or Person in clause (i) through clause (v); provided that in each case, an Entity or Person shall not be a Released Party if it timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the third-party releases contained in the Plan that is not withdrawn or otherwise resolved before Confirmation.

1.128   "**Releasing Party**" means, collectively each of, and in each case in its capacity as such: (i) the Released Parties; (ii) all Holders of Claims and Interests that elect to "opt in" to the third-party releases set forth in Article VIII hereof; and (iii) each Related Party of each Entity or Person in clause (i) and clause (ii).

1.129 "**Reorganized CCM**" means CCM in its capacity as a Reorganized Debtor.

1.130 "**Reorganized Debtors**" means any Debtors, as reorganized pursuant the Restructuring Transactions, and including any entities established to acquire all or a portion of the assets of CCM and/or its direct and indirect subsidiaries.

1.131 "**Restructured Notes**" means the Restructured Magnetar Notes, Restructured Mezzanine Notes, and Restructured Secured Convertible Notes.

1.132 "**Restructured Magnetar Notes**" means the Magnetar Notes as amended by the Magnetar Notes Term Sheet attached to the Restructuring Support Agreement.

1.133 "**Restructured Mezzanine Notes**" means the Mezzanine Notes as amended by the Mezzanine Loan Term Sheet attached to the Restructuring Support Agreement.

1.134 "**Restructured Note Documents**" the Restructured Notes, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.135 "**Restructured Secured Convertible Notes**" means the Secured Convertible Notes as amended by the Secured Convertible Loan Term Sheet attached to the Restructuring Support Agreement.

1.136 "**Restructuring Expenses**" means the reasonable and documented fees and out-of-pocket expenses of the Consenting Secured Noteholders (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with the Restructuring Support Agreement up to the caps on fees stated therein.

1.137 "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), including all annexes, exhibits, and schedules thereto, dated as of December 16, 2025, by and among the Debtors and the Consenting Secured Noteholders, attached as **Exhibit E** to this Combined Disclosure Statement and Plan, as such may be amended, modified or supplemented in accordance with the terms hereof.

1.138 "**Restructuring Transactions**" means the restructuring transactions for the Debtors, in accordance with, and subject to the terms and conditions set forth in, the Restructuring Support Agreement, the Plan and the Plan Supplement.

1.139 "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts or Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.140  "**Secured**" means when referring to a Claim:  (a) secured by a Lien on which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to this Plan as a Secured Claim (subject to the Confirmation Order becoming a Final Order).

1.141  "**Secured Convertible Notes**" those certain secured convertible promissory notes from CCM to Sesame Workshop and Dave Pottruck.

1.142  "**Secured Convertible Noteholders**" means the holders of the Secured Convertible Notes.

1.143  "**Secured Convertible Claims**" means the Claims of the Secured Convertible Noteholders on account of the Secured Convertible Notes.

1.144  "**Shenoy Declaration**" means the *Declaration of Neal Shenoy in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (D.I. 11).

1.145  "**Subordinated Claim**" means any Claims against the Debtors that is subject to subordination under Section 509(c), Section 510(b) or Section 510(c) of the Bankruptcy Code.

1.146  "**Subsidiary Debtors**" means CCM's subsidiaries who are also Debtors in these Chapter 11 Cases: KidPass, Inc., CodeSpark, Inc., Little Passports, Inc, and CCM Merger Sub II, Inc.

1.147  "**Third-Party Release**" has the meaning set forth in Article VIII of this Plan.

1.148  "**Unclaimed Distributions**" means any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for checks that have not been cashed within ninety (90) days of the mailing of the Distribution upon which time the Distribution Agent may issue a stop payment; (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available; and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 10.6 hereof.

1.149  "**Unexpired Lease**" means a lease to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.150  "**Unimpaired**" means, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.151  **U.S.**" means the United States of America.

1.152   "**U.S. Trustee**" means the Office of the United States Trustee for Region 3.

1.153   "**U.S. Trustee Fees**" means all fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code, to the extent applicable.

1.154   "**Voting Deadline**" means [____] at 4:00 p.m. (prevailing Eastern Time), the date specified in the Combined Disclosure Statement and Plan, the Ballots, the Conditional Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Conditional Approval and Procedures Order as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended by the Debtors.

1.155   "**Voting Record Date**" means [____], the date specified in the Conditional Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Conditional Approval and Procedures Order as the record date for purposes of determining: (i) the Holders of Claims and Interests in (a) the Classes entitled to vote to accept or reject the Combined Disclosure Statement and Plan and who will receive solicitation packages, and (b) the Classes not entitled to vote to accept or reject the Combined Disclosure Statement and Plan and who will receive a non-voting package; and (ii) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote to accept or reject the Combined Disclosure Statement and Plan as the Holder of a Claim.

**Rules of Interpretation**

1.156   Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" means "include, without limitation," or "including," as the case may be.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.157   Any reference in this Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.158    Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors means the Debtors and the Reorganized Debtors, as applicable and to the extent the context requires.

1.159    The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any Entity as a holder of a Claim or Interest includes that Entity's successors and assigns.

**Rules of Construction**.

(a)    **Undefined Terms**.  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

(b)    **Miscellaneous Rules**.  This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules:  (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) any reference in this Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date; (iii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (iv) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it means "on, or as soon as reasonably practicable after," such date; and (v) references in this Plan and other Plan Documents to "Section" or "Article" shall be interchangeable.

1.128    **Appendices and Plan Documents.**  All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or free of charge at https://cases.stretto.com/ConsciousContentMedia.

1.129    **Nonconsolidated Plan**.  Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

2.1    **Administrative Claims and Priority Tax Claims**.  Except with respect to Administrative Claims that are Professional Fee Claims, Claims for U.S. Trustee Fees, or subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims must

file with the Claims Agent and serve on the Debtors or the Reorganized Debtors, as applicable, requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive (as applicable) payment in full, as soon as practicable after (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, to be paid in Cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtors or the Reorganized Debtors, as applicable.

Any Person or Entity who is required to timely file such Claim but fails to do so shall not be treated as a creditor with respect to such Claim for the purpose of Distribution in these Chapter 11 Cases on account of such Claim. The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Administrative Claim Bar Date.

All U.S. Trustee Fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall be liable to pay any and all U.S. Trustee Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. Within two business days of the Effective Date, the Reorganized Debtors shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred. After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Reorganized Debtors shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of that particular case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

2.2    **Professional Fee Claims**. All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within 30 days of the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the

Estates or the Debtors, but shall revert to the Reorganized Debtors, without any further order or action of the Bankruptcy Court, only after all Allowed Professional Fee Claims have been paid in full.

Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account, as and when such Claims are Allowed by entry of an order of the Bankruptcy Court. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors. Notwithstanding the foregoing, the Holder of an Allowed Professional Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtors.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2.3    DIP Claims.

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, at the election of each Holder, in its sole discretion, each Holder shall receive: (i) payment in full in Cash of its Pro Rata share of the Allowed DIP Claims on the Effective Date, or (ii) conversion of its Pro Rata share of the Allowed DIP Claims into New Preferred Equity (Series A) of the Reorganized CCM, along with the issuance of New Warrants based on the Holder's conversion amount as described in the DIP Credit Agreement.

### 2.4    Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of these Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval provided that the Debtors and Reorganized Debtors (as applicable) shall have the right to review reasonably detailed invoices with reasonably detailed summaries of the services comprising the Restructuring Expenses and, object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors before the anticipated Effective Date; provided, further, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

# ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

3.1     **General Rules of Classification**.  The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan.  As noted herein, notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor.  For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart.  Such classification shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### 3.2   Summary of Classification and Treatment of Classified Claims and Interests.

| Class | Claim | Projected Amount of Claims / Interests[3] | Status | Voting Rights |
|---|---|---|---|---|
| **Class 1** | Other Secured Claims | *De Minimis* | Unimpaired | Not entitled to vote Deemed to accept Plan |
| **Class 2** | Other Priority Claims | *De Minimis* | Unimpaired | Not entitled to vote Deemed to accept Plan |
| **Class 3** | Magnetar Secured Claims | $99.84 million | Impaired | Entitled to vote |
| **Class 4** | 2023 Bridge Secured Claims | $11.38 million | Impaired | Entitled to vote |
| **Class 5** | Mezzanine Secured Claims | $19.19 million | Impaired | Entitled to vote |
| **Class 6** | Secured Convertible Claims | $6.86 million | Impaired | Entitled to vote |
| **Class 7** | Post-Closing Claims (Unsecured) | $56.80 million | Impaired | Entitled to vote |
| **Class 8** | General Unsecured Claims | $5-7 million | Impaired | Entitled to vote |
| **Class 9** | Intercompany Claims | $35-37 million | Unimpaired; Impaired | Not entitled to vote Deemed to accept Plan; Deemed to reject Plan |
| **Class 10** | Existing Equity Interests | 185,000,000 shares of Common Stock 89,509,473 shares of Preferred Stock | Impaired | Not entitled to vote Deemed to reject Plan |
| **Class 11** | Intercompany Interests | CCM holds 100% of Interests in each Subsidiary Debtor | Unimpaired; Impaired | Not entitled to vote Deemed to accept Plan; Deemed to reject Plan |

---

[3] The information in the table is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.

3.3     **Classification and Treatment of Classified Claims and Interests**.

**Class 1**:  **Other Secured Claims**.

(a)     **Classification, Impairment, and Voting**

Class 1 shall consist of Other Secured Claims against the Debtors.  Allowed Class 1 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b)     **Treatment**

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors or Reorganized Debtors, as applicable, and with the consent of the Consenting Secured Noteholders (not to be unreasonably withheld): (i) payment in full in Cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired.

**Class 2**:  **Other Priority Claims**.

(c)     **Classification, Impairment, and Voting**

Class 2 shall consist of Other Priority Claims against the Debtors.  Allowed Class 2 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(d)     **Treatment**

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**Class 3: Magnetar Secured Claims**.

(a)     **Classification, Impairment, and Voting**

Class 3 shall consist of the Magnetar Secured Claims. The Magnetar Secured Claims shall be Allowed in an aggregate principal amount of $64,410,000, plus all other unpaid and outstanding obligations including any accrued and unpaid interest thereon, and all applicable

24

fees, costs, charges, expenses, premiums or other amounts arising under the Magnetar Notes, as of the Petition Date.

The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a Magnetar Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each be Allowed Magnetar Secured Claim, on, or as soon as reasonably practicable after, the Effective Date, each Holder shall receive its Pro Rata share of:

(i) the Restructured Magnetar Notes; and

(ii) 2,284,090 shares of the New Common Equity.

**Class 4: 2023 Bridge Secured Claims**.

(a)    **Classification, Impairment, and Voting**

Class 4 shall consist of the 2023 Bridge Secured Claims. The 2023 Bridge Secured Claims shall be Allowed in an aggregate principal amount of $8,422,000, plus all other unpaid and outstanding obligations including any accrued and unpaid interest thereon, and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the 2023 Bridge Notes, as of the Petition Date.

The Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a 2023 Bridge Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each be Allowed 2023 Bridge Secured Claim, on, or as soon as reasonably practicable after, the Effective Date, each Holder shall receive its Pro Rata share of:

(i) $8,422,000 in Cash; and

(ii) 189,397 shares of the New Common Equity.

**Class 5: Mezzanine Noteholder Secured Claims**

(a)    **Classification, Impairment, and Voting**

Class 5 shall consist of the Mezzanine Noteholder Secured Claims. The Mezzanine Noteholder Secured Claims shall be Allowed in an aggregate principal amount of $15,000,000, plus all other unpaid and outstanding obligations including any accrued and unpaid interest

thereon, and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Mezzanine Notes, as of the Petition Date.

The Class 5 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a Mezzanine Noteholder Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each be Allowed Mezzanine Noteholder Secured Claim, on, or as soon as reasonably practicable after, the Effective Date, each Holder shall receive its Pro Rata share of:

(i) the Restructured Mezzanine Notes; and

(ii) 269,839 shares of the New Common Equity.

**Class 6: Secured Convertible Claims**

(b)    **Classification, Impairment, and Voting**

Class 6 shall consist of the Secured Convertible Claims. The Secured Convertible Claims shall be Allowed in an aggregate principal amount of $5,514,234, plus all other unpaid and outstanding obligations including any accrued and unpaid interest thereon, and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Secured Convertible Notes, as of the Petition Date.

The Class 6 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a Secured Convertible Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Secured Convertible Claim, on, or as soon as reasonably practicable after, the Effective Date, each Holder shall receive its Pro Rata share of:

(i) the Restructured Secured Convertible Notes; and

(ii) 86,673 shares of the New Common Equity.

**Class 7:  Post-Closing Claims (Unsecured)**

(a)    **Classification, Impairment, and Voting**

Class 7 shall consist of the Post-Closing Claims.  The Class 7 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a Post-Closing Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Post-Closing Claim, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Post-Closing Claim becomes an Allowed Claim, each Holder of an Allowed Post-Closing Claim shall receive its Pro Rata share of the New Convertible Notes.

**Class 8: General Unsecured Claims.**

(a)      **Classification, Impairment, and Voting**

Class 8 shall consist of all General Unsecured Claims against the Debtors. Class 8 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)      **Treatment**

Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each General Unsecured Claim, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such General Unsecured Claim becomes an Allowed Claim, each Holder of a General Unsecured Claim shall receive its Pro Rata share $250,000.

(c)      **New Notes Election**

Holders of a General Unsecured Claim may elect to receive the treatment of Class 7 through a New Notes Election described in Sections 7.5 and 10.5. Holders of General Unsecured Claims who make the New Notes Election and who vote on the Plan will have deemed to have voted in Class 8.

**Class 9**:  **Intercompany Claims**.

(a)      **Classification, Impairment, and Voting**

Class 9 shall consist of the Intercompany Claims.  If an Intercompany Claim in Class 9 is Unimpaired by the Plan, then the Holder is deemed to accept the Plan and not entitled to vote on the Plan. If an Intercompany Claim in Class 9 is Impaired by the Plan, then the Holder is deemed to reject the Plan and not entitled to vote on the Plan.

(b)      **Treatment**

On, or as soon as reasonably practicable after, the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors and with consent of the Consenting Secured Noteholders (not to be unreasonably withheld), each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and distributed, contributed, set off, canceled and released without any Distribution.

**Class 10: Existing Equity Interests**.

(a)    **Classification, Impairment, and Voting**

Class 10 shall consist of the Existing Equity Interests. Class 10 Claims are Impaired by the Plan and are therefore deemed to reject the Plan and not entitled to vote on the Plan.

(b)    **Treatment**

On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished and shall be of no further force and effect

**Class 11: Intercompany Interests**.

(c)    **Classification, Impairment, and Voting**

Class 11 shall consist of the Intercompany Interests. If an Intercompany Interest in Class 11 is Unimpaired by the Plan, then the Holder is deemed to accept the Plan and not entitled to vote on the Plan. If an Intercompany Interest in Class 11 is Impaired by the Plan, then the Holder is deemed to reject the Plan and not entitled to vote on the Plan.

(d)    **Treatment**

On, or as soon as reasonably practicable after, the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors and with consent of the Consenting Secured Noteholders (not to be unreasonably withheld), each Allowed Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and distributed, contributed, set off, canceled and released without any Distribution.

3.4    **Special Provisions Regarding Unimpaired Claims.**

The Debtors, the Reorganized Debtors and any other Entity shall retain all defenses, counterclaims, rights to setoff and rights to recoupment, if any, as to Unimpaired Claims. Holders of Unimpaired Claims shall not be required to file a Proof of Claim with the Court and shall retain all their rights under applicable non-bankruptcy law to pursue their Unimpaired Claims in any forum with jurisdiction over the parties. Notwithstanding anything to the contrary in the Plan, each Holder of an Unimpaired Claim shall be entitled to enforce its rights in respect of such Unimpaired Claim against the Debtors or the Reorganized Debtors, as applicable, until such Unimpaired Claim has been either (i) paid in full (a) on terms agreed to between the Holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, or (b) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (ii) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

3.5    **Subordinated Claims**.

Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Claim or Existing Equity Interest as a Subordinated Claim.

# ARTICLE IV
# BACKGROUND AND DISCLOSURES

### 4.1    General Background.[4]

(a)    *Corporate Background.*

Originally founded in 2012, CCM  is headquartered in New York and, as of the Petition Date, had approximately 50 full-time employees and five individual contractors. In 2016, CCM formed CCM Merger Sub II, Inc. in order to acquire Homer Learning, Inc. In 2021, CCM acquired codeSpark, Inc., Kidpass Inc., and Little Passports Inc. as a part of its strategic plan to build a multi-age, multi-stage, multi-subject, and multi-modal portfolio capable of delivering the best educational start possible for children ages two to ten years old.  CCM currently owns and controls each of the Subsidiary Debtors.  In addition, CCM currently owns or controls, directly or indirectly, certain non-debtor subsidiaries.  As of the Petition Date, the non-debtor subsidiaries hold no assets and have no operations and have not commenced chapter 11 cases of their own.  A summary chart depicting the Debtors' corporate structure is depicted in **Table 1** below.

**Table 1**



Together, the Debtors are a market leader in the fast-growing early learning segment of education technology.  They have a proprietary, proven early learning system offered in schools and sold directly to parents through subscriptions. The Debtors' programs serve children ages two to ten to prepare them for school readiness through an age- and stage-based curriculum that develops core 21st-century skills, including social-emotional learning, reading,

---

[4]    Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declarations, which are incorporated by reference herein.

mathematics, coding, creativity, and enrichment. This curriculum is delivered through a combination of digital applications, physical learning kits, classes, tutoring, and coaching.

The Debtors' suite of products, including Homer, codeSpark, and Little Passports are best in class having received 65+ industry awards including Parents' Choice, Teachers' Choice, and Academics' Choice Awards, earning grants from National Science Foundation and Kellogg Foundation, successfully completing multiple efficacy studies at world renowned institutions such as New York University, featuring an average 60+ Net Promoter Score with consumers, and being named one of Fast Company's "10 Most Innovative Companies Globally in Education."

Building on their strong experience in the educational technology space and their well-known strategic partners, the Debtors currently offer, among others, the following learning products:





**HOMER**: HOMER is a learn-to-read app aimed at kids 2 – 6.  It is proven to increase early reading scores by 74% in just 15 minutes a day. Through over one thousand research-backed games and based upon stories families love, HOMER provides personalized activities based on a kid's age, interests, and skill level, it takes kids through a step-by-step path to reading successfully.  This reading pathway starts with foundational skills such as learning letters and sounds and ends

with reading comprehension and fluency. HOMER aims to provide foundational reading skills that set children up for success in school and life.





**codeSpark**: codeSpark is the #1 learn-to-code app for kids 3 – 10, improving problem-solving, sequencing, and early coding skills in just 90 minutes of play. With hundreds of games and activities that boost creativity, critical thinking, and more, codeSpark aims to make coding accessible and fun while teaching vital skills for a tech-driven world.  It teaches kids to code using a drag-and-drop interface that makes learning interactive and fun. Kids start with simple puzzles that build foundational skills like sequencing, logic, and problem-solving. As they progress, they create their own games and stories, applying what they've learned. Each project boosts confidence in coding and critical thinking, while keeping kids engaged and excited about learning at their own pace.





**Little Passports**: Little Passports is a direct-to-consumer children's brand developing original stories and activities focused on geography, culture, science, and art for learners as young as age 3 and up. A Little Passports subscription l delivers a new package each month with hands-on projects, activity booklets, stories, stickers, and more helping children learn about science, math, space, animals, and world cultures.

Initially, the Debtors' focus was on early childhood literacy with an emphasis on teaching young children how to read and inspiring a love of reading through its award-winning HOMER product. In 2021, with the support of the Debtor's board and investors, the Debtors embarked upon an ambitious plan to build the most comprehensive system for early childhood education and subsequently acquired codeSpark, Inc., Kidpass, Inc., and Little Passports, Inc. The acquisition of these companies helped expand the Debtors' curriculum, content catalog, and capabilities in service of building a multi-age, multi-stage, multi-subject, and multi-modal portfolio capable of delivering the best educational start for children 2 – 10 years old. Today, the Debtors have one of the largest content catalogs in early learning featuring 3,000+ stories, songs, games, lessons, activity kits, and workbooks mapped by age, stage, skill, and interest and personalized to a child's unique learning profile.

The Debtors and their products have helped over 15 million children with early learning and school readiness since their introduction. At a time where reading and math scores in the U.S. are at an all-time low and parental anxiety is at an all-time high, the Debtors' goal in restructuring their debt and successfully emerging from these Chapter 11 Cases is to serve

millions more families and their children. The Debtors intend to expand their award-winning product to support parents in their child's early learning journey by helping them make critical daily decisions about their child's learning and readiness – providing clear, personalized action plans, daily learning missions and activities, recommendations tailored to their unique context, and connections to teachers and other caregivers. The Debtors believe that parents will engage consistently, feel more confident and secure in their child's progress, and provide their children the best start possible. Given the importance of their impact-based mission, the Debtors will offer both free and paid versions of their products to reach and serve as many families as possible regardless of their socio-economic status.

(b)    *The Debtors' Prepetition Capital Structure.*

As of the Petition Date, the Debtors have approximately $205 million of funded principal debt and interest obligations, consisting of obligations under the Magnetar Notes, the 2023 Bridge Notes, the Mezzanine Note, the Secured Convertible Notes, the DIP Bridge Loan, the Post-Closing Notes, and the Marketing LOC:

| Debt Instrument | Maturity | Security | Rate | Approximate Outstanding Amount (millions) |
|---|---|---|---|---|
| Magnetar Notes | Jan. 30, 2026 | All Debtors' assets except accounts receivable (AR) and inventory on a first lien basis; AR and inventory on a second lien basis | 14.5% | $99.84 |
| 2023 Bridge Notes | March 31, 2025 June 30, 2025 | AR and inventory of CCM on a first lien basis; all other assets of CCM on a second lien basis | 18% | $11.38 |
| | | | 0.5% (Monthly Extension Fee) | |
| | | | 2% (Monthly Warrant Issuances) | |
| Mezzanine Note | Feb. 28, 2026 | All CCM's assets on a third lien basis | 15% | $19.19 |
| Secured Convertible Notes | March 31, 2026 | All CCM's assets on a fourth lien basis | 12% | $6.86 |
| DIP Bridge Loan | Dec. 31, 2025 | All CCM's assets on a fifth lien basis | 12% | $6.76 |
| Post-Closing Notes | April 30, 2026 July 28, 2026 Nov. 5, 2026 | None / Unsecured | 8% | $56.80 |
| Marketing LOC | Monthly pay | None / Unsecured | 40% APR | $3.78 |
| Total Funded Debt | | | | $204.6 |

### i.    *Magnetar Notes*

**Magnetar Note Issuance Agreement**.  On or about November 5, 2021, the Debtors entered into that certain  Note Issuance Agreement (as amended from time to time, the "**Magnetar Note Issuance Agreement**"), by and among, the Debtors, Magnetar Financial LLC, in its capacity as representative of the holders referred to therein, the holders referred to therein, the Magnetar Collateral Agent, and the other parties from time to time party thereto.  The Magnetar Note Issuance Agreement provides for the issuance of convertible senior secured notes in the aggregate initial principal amount of $60 million, which was increased to $64.41 million on September 26, 2023.

**Magnetar Liens**.  To secure the obligations under the Magnetar Notes, the Debtors granted the Magnetar Collateral Agent (on behalf of the Magnetar Noteholders) first priority perfected security interests in all assets of the Debtors. Subsequently, the Magnetar Collateral Agent entered into that certain Intercreditor Agreement dated as of March 28, 2023 ("**First Lien Intercreditor Agreement**"), by and between, the Magnetar Collateral Agent and Ascot Capital LLC, as holder of certain of the 2023 Bridge Notes and as the 2023 Bridge Collateral Agent. Pursuant to the First Lien Intercreditor Agreement, the Magnetar Collateral Agent subordinated its first priority perfected security interests in CCM's accounts receivables and inventory to the 2023 Bridge Collateral Agent. Accordingly, the obligations under the Magnetar Notes are secured by second priority perfected security interests in CCM's accounts receivable and inventory and first priority perfected security interests in all other assets of Debtors.

### ii.    *2023 Bridge Notes*

**2023 Bridge Notes**.  From March 28, 2023 through May 26, 2023, CCM issued the 2023 Bridge Notes to the 2023 Bridge Noteholders in the aggregate principal amount of $10.0. In January 2024, certain of the 2023 Bridge Noteholders converted $1.6 million of principal into preferred Existing Equity Interests of  CCM resulting in a remaining principal amount of $8.4 million

**2023 Bridge Liens**.  To secure the obligations under the 2023 Bridge Notes, CCM granted the 2023 Bridge Collateral Agent (on behalf of the 2023 Bridge Noteholders) first priority perfected security interests in CCM's accounts receivable and inventory and second priority perfected security interests in all other assets of CCM.

### iii.    *Mezzanine Note*

**Mezzanine Note**.  On January 26, 2024, CCM issued  the Mezzanine Note to the Mezzanine Noteholder in the principal amount of $15.0 million. A director on CCM's Board of Directors is affiliated with the Mezzanine Noteholder.

**Mezzanine Liens**.  To secure the obligations under the Mezzanine Note, CCM granted the Mezzanine Noteholder third priority perfected security interests in all assets of CCM.

### iv.    *Secured Convertible Notes*

**Secured Convertible Notes**.  Pursuant to that certain Note Purchase Agreement dated as of January 26, 2024, CCM issued the Secured Convertible Notes to the Secured Convertible Noteholders in the aggregate principal amount of $5,514,234.

**Secured Convertible Liens**.   To secure the obligations under the Secured Convertible Notes, CCM granted the Secured Convertible Noteholders fourth priority perfected security interests in all assets of CCM.

### v.    *DIP Bridge Loan*

**DIP Bridge Loan**.  On September 15, 2025, CCM issued a secured promissory note to finance an out-of-court restructuring and serve as a bridge to these Chapter 11 Cases, if required ("**DIP Bridge Loan**").  The DIP Bridge Noteholders consist of: (a) over fifty minority, non-controlling shareholders of CCM; (b) Neal Shenoy, the CEO and a director on the Board of Directors of CCM; and (c) [212]MEDIA, LLC, in which Mr. Shenoy is one of the managing members. As of the Petition Date, approximately $6,758,483 million in aggregate principal amount remained outstanding on the DIP Bridge Loan, all of which the Debtors have requested to roll into the DIP Facility. The DIP Bridge Loan consists of: (i) a working capital loan in the amount of $2,567,688 funded by Mr. Shenoy and [212]MEDIA, LLC between February 10, 2025 and September 15, 2025; and (b) a restructuring bridge loan in the amount of $4,455,795 funded between September 16, 2025 and the Petition Date, of which Mr. Shenoy funded $550,000 and the remainder was funded by over fifty minority, non-controlling shareholders of CCM. Certain of the funds of the DIP Bridge Loan were earmarked repay: (x) Reitler, Kailas & Rosenblatt LLP, proposed counsel to the Debtors, for pre-petition fees and expenses of $359,349.33; (y) Mr. Shenoy for advances made by him under the DIP Bridge Loan in amount of $205,000.00; and (z) to  [212]MEDIA, LLC for advances made by it under the DIP Bridge Loan  in the amount of $60,000.00.  As of the Petition Date, [212]MEDIA, LLC and Mr. Shenoy held $2,857,688 of the aggregate principal balance of the DIP Bridge Loan. [212]MEDIA, LLC and Mr. Shenoy are both Insiders of the Debtors.

**Secured Convertible Liens**.  To secure the obligations under the DIP Bridge Loan, CCM granted the DIP Bridge Noteholders fifth priority perfected security interests in all assets of CCM.  In addition, in a letter agreement dated October 2025, and again in the Restructuring Support Agreement, the Consenting Secured Noteholders agreed to consent to a roll-up of the DIP Bridge Loan into the DIP Facility and subordinate their security interests to the DIP Facility  (including the roll-up of the DIP Bridge Loan therein).

### vi.    *Post-Closing Notes*

Pursuant to Agreements and Plans of Merger and Reorganization dated as of April 30, 2021, July 28, 2021 and November 5, 2021, CCM acquired CodeSpark, Inc., KidPass, Inc., and Little Passports, Inc. for merger consideration consisting of post-closing unsecured promissory notes issued to the former shareholders of such companies in the aggregate principal amount of $41,520,911 (the "**Post-Closing Notes**"), in addition to other merger consideration, including Cash, earn-outs, and Existing Equity Interests.

*vii.      Marketing LOC*

CCM entered into an Amended and Restated Insertion Order #1 dated November 1, 2024 with Tilting Point Fund 2, LLC ("**Tilting Point**") pursuant to which Tilting Point provided campaign management services and user acquisition spend ("**UA Spend**") for certain Debtors (the "**Marketing LOC**"). CCM was required to pay Tilting Point (a) a monthly management fee of 8% of the amount of UA Spend for each month, and (b) a funding fee consisting of (i) the amount of UA Spend funded by Tilting Point during each month and (ii) a 19% funding fee, with payment of each funding fee being made in 12 equal monthly installments during the term of the agreement.

*viii.      Trade Debt*

In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, utility providers, and services providers, among others.  As of the Petition Date, the Debtors' estimated outstanding trade payables was approximately $6-7 million.

*ix.      Existing Equity Interests*

CCM is authorized to issue 185,000,000 shares of Common Stock, par value $0.0001 per share, of which 34,683,377 shares are issued and outstanding, and 89,509,473 shares of Preferred Stock, par value $0.0001 per share, of which:

(i)      6,160,000 shares of Preferred Stock are designated Series A Preferred Stock, all of which are issued and outstanding,

(ii)      2,322,469 shares of Preferred Stock are designated Series A-1 Preferred Stock, all of which are issued and outstanding,

(iii)      5,791,099 shares of Preferred Stock are designated Series B Preferred Stock, of which 5,706,099 are issued and outstanding,

(iv)      8,199,333 shares of Preferred Stock are designated Series B-1 Preferred Stock, all of which are issued and outstanding,

(v)      8,825,009 shares of Preferred Stock are designated Series B-2 Preferred Stock, all of which are issued and outstanding,

(vi)      17,674,986 shares of Preferred Stock are designated Series C Preferred Stock, all of which are issued and outstanding,

(vii)      2,927,315 shares of Preferred Stock are designated Series C-1 Preferred Stock, all of which are issued and outstanding,

(viii)      9,725,400 shares of Preferred Stock are designated Series D Preferred Stock, of which 6,725,585 are issued and outstanding, and

(ix)    27,893,862 shares of Preferred Stock are designated Series D-1 Preferred Stock, of which 24,884,813 are issued and outstanding.

CCM also has issued and outstanding (a) warrants to purchase 14,500,000 shares of Common Stock, (b) stock options under its 2016 Stock Plan to purchase 2,358,027 shares of Common Stock and (c) 32,639,766 Phantom Common Shares under its 2015 Second Amended and Restated Phantom Stock Plan.

## 4.2    **Events Leading to Chapter 11**.

The need to restructure the Debtors' balance sheet and address their capitalization needs arose from several factors that affected the Debtors' performance over recent years.

As discussed above, in 2021, CCM embarked upon an ambitious plan to build the most comprehensive system for early childhood education and subsequently acquired codeSpark, Inc., Kidpass, Inc., and Little Passports, Inc.  The acquisition of these companies helped expand the Debtors' curriculum, content catalog, and capabilities, but also left the Debtors with a substantial debt burden.  Debtors raised the capital needed to pay for the cash Component of these acquisitions by issuing the Magnetar Notes.  In addition, CCM issued the Post-Closing Notes to each of the approximately 180 shareholders of the acquired companies.

Subsequent to these acquisitions, the Debtors raised capital in 2023 under the 2023 Bridge Notes and in 2024 under the Mezzanine Note and Secured Convertible Notes to fund its research & development and working capital needs.

The Debtors raised significant capital to fund acquisitions and working capital under the expectation that its revenues would grow predictably and it would operate profitably, enabling it to service, repay or refinance its debt at maturity in the future.  Like many education technology companies, the Debtors experienced headwinds as heightened consumer demand during the 2020 pandemic returned to pre-pandemic levels, customer acquisition costs increased significantly as online marketing became more expensive and less efficient, and raising equity capital became more challenging given market conditions.  As a result, the Debtors could not achieve profitability on the timeline that they expected and were dependent on raising additional capital to fund their operations and execute their plan.

Over the past several months, the Debtors have worked collaboratively with many of their stakeholders to arrange for funding to enable the Debtors to continue their business operations and to right-size the existing obligations on their balance sheets.

Over the spring and summer of 2025, the Debtors' leadership worked closely with CCM's Board of Directors to secure equity investment required for working capital and to pay off a portion of the debt that was maturing.  The Debtors successfully identified potential new investors (the "**Series E Preferred Investors**") who believed in the Debtors' mission and were prepared to underwrite their products and go-to-market strategy.  In August 2025, the Series E Preferred Investors agreed to a term sheet that would facilitate a Series E preferred share financing ("**Series E Financing**") on attractive terms.  As part of their proposed investment, it was required that the Debtors execute a consensual restructuring with their existing secured and unsecured

noteholders, which included converting a portion of their debt into equity on terms similar to the Series E Preferred Share Investors and extending the maturity date of their secured and unsecured debt by at least three years. The Debtors were able to secure support from the Consenting Secured Noteholders for this potential out-of-court restructuring. However, securing approvals from approximately 180 Post-Closing Noteholders proved an insurmountable task, despite attempts to do so over an extended three-month period of time. Ultimately, the Debtors were able to reach a consensus with a majority of the unsecured noteholders, but since unanimous consent was required to affect a consensual out-of-court restructuring, the Debtors were unable to close the new Series E Financing outside of these Chapter 11 Cases.

To that end, after determining that they were unlikely to consummate an out-of-court restructuring transaction, the Debtors continued proactively exploring their options, considering all available strategic alternatives to improve the Debtors' liquidity position and recapitalize their balance sheets. Ongoing discussions with the Debtors' stakeholders ultimately resulted in the Restructuring Support Agreement with the Consenting Secured Noteholders and the filing of these Chapter 11 Cases.

### 4.3    **The Chapter 11 Cases**.

(a)    *Generally*.

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that a debtor is authorized to continue to operate its business and remain in possession of its property as a "debtor in possession." From the Petition Date, the Debtors have continued to operate their business and manage their properties as debtors and debtors in possession. By order entered December 18, 2025 (D.I. 25), the Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee, examiner, or Committee has been appointed in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect from the Petition Date until the Effective Date of the Plan.

(b)    *"First Day" Motions and Related Applications*.

On the Petition Date and the next day, the Debtors filed a number of "first day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. On December 18, 2025, the Bankruptcy Court entered orders providing various forms of first-day relief, including interim or final orders approving:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases, and (II) Granting Related Relief*

- *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 30 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, and (III) Granting Related Relief*

- *Debtors' Application for Appointment of Stretto, Inc. as the Claims and Noticing Agent*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Financing Agreements and Pay All Insurance Obligations Arising thereunder, and (B) Renew, Supplement, Modify, or Enter into Insurance Policies and Financing Agreements; and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment to Utility Companies, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Existing Cash Management Systems, Including Continued Use of Existing Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor All Obligations Related Thereto; and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Payment of Prepetition Claims of Critical Vendors*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief*

- *Motion of the Debtors for Interim and Final Orders: (i) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Modifying the Automatic Stay; (IV) Authorizing Use of Cash Collateral; (V) Granting Adequate Protection; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief*

(c)     *DIP Facility*

The Debtors have entered into a senior secured, priming, and super-priority DIP Facility with the DIP Agent and other DIP Lenders party thereto in the aggregate principal amount of up to $10 million (inclusive of the roll-up of the DIP Bridge Loan) upon the term described in the DIP Credit Agreement and the DIP Orders. The DIP Agent, [212]MEDIA, LLC, and one of the DIP Lenders, Neal Shenoy, are both Insiders of the Debtors.

The Debtors do not believe they are able to obtain financing to fund and preserve their assets on terms more favorable than those offered by the DIP Lenders under the DIP Facility and that they are (and have been) unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. It is clear that the Debtors are not able to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lenders under the DIP Facility. Indeed, even with respect to the DIP Lenders, the DIP Facility is available only with the Debtors' agreements to grant (a) the DIP Liens; and (b) the other protections set forth in the DIP Orders.

(d)     *Retention of Professional Advisors*

The Debtors have filed applications to retain and employ (a) Reitler Kailas & Rosenblatt LLP as their bankruptcy counsel (D.I. 39), (b) Bayard, P.A. as co-counsel (D.I. 37); (c) Eisner Advisory Group LLC as their financial advisor (D.I. [__]), and (d) Stretto, Inc. as their administrative advisor (D.I. 38).

(e)     *Claims Process and Bar Dates*

i.     *Schedules & Statements*

On January [__], 2026, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (D.I. [_-_]), with the Bankruptcy Court, each of which are incorporated hereto in their entirety by reference.

ii.     *Section 341(a) Meeting of Creditors*

The section 341(a) meeting of creditors is scheduled to be held on [__], 2026.

iii.     *Bar Date Order and Bar Dates*

On January [__], 2026, the Bankruptcy Court entered the Bar Date Order and established the following Bar Dates:

(1)     General Bar Date: [__], 2026 at 4:00 p.m. (ET) as the deadline for each person or Entity other than a Governmental Unit to file a Claim in respect of a prepetition Claim against any Debtor;

(2)     Governmental Bar Date: [__], 2026 at 4:00 p.m. (ET) as the deadline for Governmental Units to file a Claim in respect of a prepetition Claim against any Debtor;

(3)      Amended Schedules Bar Date: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable; and (ii) 4:00 p.m. (ET) on the date that is thirty (30) days from the date on which the Debtor provides notice of an amendment or supplement to the Schedules;

(4)      Rejection Damages Bar Date:  the later of (i) the General Bar Date; (ii) 30 days after the Claimant is served with notice of the applicable Bankruptcy Court order authorizing the rejection of the Executory Contract or Unexpired Lease at issue; or (iii) any other date that the Court may fix in the applicable rejection order for the Rejection Damages Claims Bar Date as the deadline for the non-debtor counterparty to the applicable rejected executory contracts and leases to file proofs of Claim based on any relief set forth in the applicable rejection order.

## ARTICLE V
## CONFIRMATION AND VOTING PROCEDURES

5.1      **Confirmation Procedure**.  On January [__], 2026, the Bankruptcy Court entered the Conditional Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled for **February [__], 2026 at [__] (prevailing Eastern Time)** to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

5.2      **Procedure for Objections**.  Any Objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Existing Equity Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Combined Disclosure Statement and Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received on or before **February [__], 2026 at 4:00 p.m. (prevailing Eastern Time)** by the following parties: (a) the Debtors; (b) proposed  co-counsel  to  the  Debtors:  (i)  Bayard  P.A.,  Attn:  Daniel  N.  Brogan (dbrogan@bayardlaw.com),  and  Steven  D.  Adler,  (sadler@bayardlaw.com),  and  (ii)  Reitler Kailas  &  Rosenblatt  LLP,  Attn:  Lauren  Friend  McKelvey  (lmckelvey@reitlerlaw.com),  and David N. Tabakin (dtabakin@reitlerlaw.com); (c) Counsel to DIP Agent, Landis Rath & Cobb LLP,  Attn:  Kimberly  A.  Brown  (brown@lrclaw.com)  and  Elizabeth  A.  Rogers (erogers@lrclaw.com); (d) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 Attn: Timothy J. Fox, Jr. (timothy.fox@usdoj.gov); and (e) counsel to any Committee appointed in these Chapter 11 Cases. Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

5.3 **Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

5.4 **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan,

to make such modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 5.5    Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan.  Under section

1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3 through 8 are Impaired and are entitled to vote on the Plan.  Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code. Holders of Claims or Interests in Classes 9 and 11 ("**Intercompany Classes**") will, at the Debtors' election, either be reinstated in full or will not receive any distributions under the Plan. As such, the Intercompany Classes are either (i) conclusively deemed to have accepted the Combined Disclosure Statement and Plan pursuant to section 1126(f); or (ii) are not receiving a Distribution, and thus, such Holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 5.6    Confirmation without Necessary Acceptances

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that: (a) the Plan does not discriminate unfairly with respect to each non-accepting impaired class; (b) the Plan is fair and equitable with respect to each non-accepting impaired class; and (c) at least one impaired class has accepted the Plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

Specifically, with respect to unsecured claims, a plan is "fair and equitable" if either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan. With respect to equity interests, a plan is "fair and equitable" if either (x) each holder of an equity interest will

receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (y) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest. As demonstrated by the Valuation Analysis, based on an application of the Bankruptcy Code's priority scheme, the Post-Closing Claims, General Unsecured Claims, and Existing Equity Interests, which are junior in priority to over $145 million in funded indebtedness, are not entitled to any recovery in the Chapter 11 Cases. Similarly, the Liquidation Analysis demonstrates that Holders of Post-Closing Claims, General Unsecured Claims, and Existing Equity Interests would not receive any recovery in a hypothetical liquidation scenario.

Notwithstanding that the Holders of Post-Closing Claims and General Unsecured Claims are not entitled to any recovery under the provisions of the Bankruptcy Code, as a result of the extensive arms' length negotiations between the Debtors and the Consenting Secured Noteholders, the Consenting Secured Noteholders agreed to allocate a meaningful portion of their Secured Claims to ensure recovery to the Post-Closing Claims and General Unsecured Claims. The Consenting Secured Noteholders allocated this recovery to facilitate a smooth transaction and chapter 11 process and have conditioned this recovery on the Debtors' ability to consummate the restructuring on the terms and timeline set forth in the Restructuring Support Agreement. The Debtors therefore believe that the Plan satisfies the "unfair discrimination" and "fair and equitable" tests with respect to any non-accepting impaired class.

### 5.7    Best Interests Test and Liquidation Analysis.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of Cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the Cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

The Debtors have determined, as discussed in the Liquidation Analysis attached as **Exhibit B** hereto, that confirmation of the Plan will provide each creditor and Interest holder of each Debtor with a recovery that is not less than it would receive pursuant to a liquidation of the applicable Debtor under chapter 7 of the Bankruptcy Code.

5.8    **Valuation**

As described in greater detail above, the Plan, including the Plan Supplement, is the culmination of extensive negotiations among the Debtors and the Consenting Secured Noteholders regarding a restructuring of the Debtors. The Debtors obtained the Valuation Analysis attached hereto as **Exhibit C**.

5.9    **Financial Feasibility**

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for the fiscal years 2026 through [2028] (the "**Financial Projections**"). The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in **Exhibit D** hereto.

THE FINANCIAL PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW IN ARTICLE VI. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared these financial projections based upon certain assumptions that they believe to be reasonable under the circumstances. The financial projections have not been examined or compiled by independent accountants. The Debtors makes no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan. The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Debtors' future capital expenditures and other obligations during the applicable period. Accordingly, if the Chapter 11 Cases are commenced, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

### 5.10    Releases & Exculpations

The Plan proposes to release the Released Parties and exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element among the Debtors and such parties in obtaining their continued support for the Restructuring Support Agreement and the Plan.

The Released Parties and the Exculpated Parties, including current directors and officers, have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Restructuring Support Agreement and the Plan, which, maximizes and preserves the going-concern value of the Debtors for all parties in interest, including employees, and further, optimizes recoveries and provides for the best possible conclusion of these Chapter 11 Cases. The proposed releases and exculpations preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to stakeholders that elect to give and receive consensual third-party releases. These Chapter 11 Cases could not be administered, and the Plan could not have been realized, but for the contributions of such officers and directors.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The releases, exculpation, and injunction provisions are set forth in Article VIII hereof.

### 5.11    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Conditional Approval and Procedures Order.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THE DEBTORS URGE YOU TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. Please be sure to complete the Ballot properly and legibly and to identify the exact amount of your Claim and the name of the Holder. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot, or you lost your Ballot, or if you have any questions concerning the Plan or procedures for voting on the Plan, please contact the Claims Agent by (a) writing to Conscious Content Media Inc., et al. Ballot Processing, c/o Stretto, Inc., 410 Exchange, Suite 100, Irvine, CA 92602; (b) calling the Debtors' restructuring hotline at (833) 216-0881 (U.S./Canada, Toll-Free) and +1 (949) 229-8458 (International, Toll); or (c) emailing Stretto via TeamCCM@stretto.com. Parties will also be able to contact the Voting Agent via the "Live Chat" and "Contact Us" links at the "Info Center" of the Debtors' restructuring website,

maintained by the Voting Agent at https://cases.stretto.com/ConsciousContentMedia, at which website parties may also download a copy of the Combined Disclosure Statement and Plan for no charge.

## ARTICLE VI
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND ASSOCIATED DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 6.1    **The Plan May Not Be Accepted**.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

### 6.2    **The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent liquidation.

### 6.3    **Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan.**

Plan constitutes a settlement, compromise and release of all rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan, taking into account and conforming to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination or section 510(b) and (c) of the Bankruptcy Code. This settlement, compromise and release require approval by the Bankruptcy Court. The Debtors cannot ensure that the Bankruptcy Court will approve of the settlement contemplated in the Plan.

The Plan also provides for certain releases, injunctions and exculpations that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties. The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan, notwithstanding the existence of the Restructuring Support Agreement.

### 6.4     Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### 6.5     Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.  The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of

the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.6     **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

6.7     **Extended stay in the Chapter 11 Cases**.

Implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed. Even if the Plan is confirmed on a timely basis, the Chapter 11 Cases could themselves have an adverse effect on the Debtors' business.

There is a risk, due to uncertainty about the Debtors' future, that:

- Subscribers could seek alternative sources of products from the Debtors' competitors, including competitors that are in little or no relative financial or operational distress;

- Employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- Vendors, suppliers or agents and other business partners could terminate their relationship with the Debtors or require financial assurances or trade terms which are materially different from what the Debtors have today.

A lengthy bankruptcy proceeding would also involve significant expenses and divert the attention of management from operating the Debtors' business, as well as creating concerns for employees, suppliers and members. The disruption that the Chapter 11 Cases could inflict upon the Debtors' business would increase with the length of time it takes to complete the Chapter 11 Cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom the Debtors depend, including vendors, employees, and subscribers. If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed.

A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

6.8    **Termination of the Restructuring Support Agreement in certain circumstances**.

Pursuant to the Restructuring Support Agreement, the Consenting Secured Noteholders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain termination events under the Restructuring Support Agreement. Such termination events include, among other things, the failure of the Debtors to reach certain milestones in the Chapter 11 Cases in a timely manner, such as the occurrence of the Effective Date in accordance with the timeline set forth in the Restructuring Support Agreement. While the Debtors believe that they will be able to meet such milestones, there can be no assurance that will be the case. Additional events that constitute termination events under the Restructuring Support Agreement include the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a court or governmental agency of competent jurisdiction that the transactions contemplated by the Plan cannot legally go forward. See **Exhibit E** for additional detail. If a termination event occurs and the support of the Consenting Secured Noteholders were to be withdrawn, and the votes of such holders were revoked, the Debtors may need to amend the Plan and re-solicit votes thereon, or formulate a new chapter 11 plan and solicit votes on such new plan. Such amendment and/or re-solicitation could cause material delay in the Chapter 11 Cases, and may adversely impact the Debtors' businesses and their ability to reorganize.

6.9    **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Classes 3 and 4 Prepetition Lenders' Claims and Class 5 General Unsecured Claims under the Plan.

6.10    **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described herein.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.    ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

6.11    **Risks Associated with the Debtors' Business**.

(a)    Competition from other early-education industry participants or the development of additional competitive early education products and services could result in decreased demand for the Debtors' services and products.

(b)    A failure to continue to retain and grow the Debtors' subscriber base could adversely affect the Debtors' results of operations and business.

(c)    The Debtors may not be able to successfully execute their business plan or strategic initiatives.

(d)    If the Debtors do not continue to develop new, innovative services and products or if the Debtors' services, products or brands do not continue to appeal to the market, or if the Debtors are unable to successfully expand into new channels of distribution or respond to consumer trends or sentiment, the Debtors' business may suffer.

(e)    The Debtors may not be successful in evolving their offerings, which could adversely affect their business, brand, or financial results.

(f)    The Debtors' business depends on the effectiveness and efficiency of their advertising and marketing programs across multiple platforms, including the strength of their social media presence, to attract and retain members and subscribers.

(g)    Loss of key personnel, strategic partners or consultants or failure to effectively manage and motivate the Debtors' workforce could negatively impact their sales of services and products, business, financial condition and results of operations.

(h)    The Debtors' business may decline as a result of, or uncertainties related to, a downturn in general economic conditions or consumer confidence, including as a result of the existing inflationary environment, changes in tariffs and escalating trade tensions, rising interest rates, the potential impact of political and social unrest and increased volatility in the credit and capital markets.

(i)    The seasonal nature of the Debtors' business could cause their operating results to fluctuate.

(j)    The inability to renew certain of the Debtors' licenses, or the inability to do so on terms that are favorable to the Debtors, could have an adverse effect on the Debtors' financial results.

(k)    A cybersecurity incident could negatively impact the Debtors' business.

## ARTICLE VII
## MEANS OF IMPLEMENTING THE PLAN

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

7.1     **Corporate and Organizational Existence**.

The Debtors or Reorganized Debtors, as applicable, are authorized, but not required, to take any actions they determine to be necessary or advisable to effectuate the dissolution of any of the Debtors under applicable law, including, without limitation, the filing of any certificate of dissolution or certificate of cancellation, as applicable, in the office of the Secretary of State of any applicable state. The organizational structure of the Reorganized Debtors shall be described in the Plan Supplement. Subject to the preceding paragraph, except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth herein or in the Plan Supplement, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

7.2     **Corporate Action; Restructuring Transactions**.

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects and the Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization or capital structure subject to and consistent with the terms of the Plan, including: (i) adoption or assumption, as applicable, of the agreements with existing management; (ii) selection of the directors, managers, and officers for the Reorganized Debtors; (iii) implementation of the Restructuring Transactions; (iv) issuance and distribution of the New Equity by the Distribution Agent; (v) adoption of the New Organizational Documents; (vi) entry into the New Convertible Notes; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts or Leases; (viii) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (ix) the dissolution of any of the Debtors and (x) all other acts or actions contemplated or reasonably necessary or appropriate to properly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on or after the Effective Date), including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the New Organizational Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be

authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Organizational Documents, the New Convertible Notes, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law. The Confirmation Order shall and shall be deemed to, pursuant to sections 105(a), 363, and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

7.3    **Organizational Documents of the Reorganized Debtors**.

On the Effective Date, the New Organizational Documents shall become effective and be deemed to amend and restate the Debtors' existing corporate governance documents without the need for any further notice or approvals. To the extent necessary, the New Organizational Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, each Reorganized Debtor may amend and restate its existing corporate governance documents, as permitted by applicable law and pursuant to the terms contained therein.

7.4    **Managers, Directors and Officers of Reorganized Debtors; Corporate Governance**.

On the Effective Date, the New Board shall be selected in accordance with the New Organizational Documents. To the extent known and not previously disclosed, the Debtors will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to serve on the New Board or as an officer of the Reorganized Debtors, and, to the extent such Person is an Insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person. On the Effective Date, Reorganized CCM shall enter into the New Organizational Documents in substantially the forms included in the Plan Supplement and each Holder of New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized CCM. On the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be appointed in accordance with the Plan and the New Organizational Documents and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents. Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, on the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Reorganized Debtors, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

7.5     **New Notes Election**.

Each Holder of a General Unsecured Claim may elect to receive the same treatment as Class 7 Post-Closing Claims in the form of New Convertible Notes ("**New Notes Election**"); provided that any holder of a General Unsecured Claim that elects to receive New Convertible Notes must certify to the reasonable satisfaction of the Debtors that it is: (i) an "accredited investor" as defined in Regulation D promulgated under the Securities Act; or (ii) entitled to rely upon an exemption from registration requirements under (x) section 4(a)(2) of the Securities Act, (y) Regulation S under the Securities Act, or (z) such other exemptions as may be available from any applicable registration requirements ("**New Notes Certification**"). To validly make a New Notes Election, each Holder of a First Lien Claim must comply with the procedures set forth in Section 10.5 below. For the avoidance of doubt, if a Holder of a General Unsecured Claim elects to make a New Notes Election, such Holder must do so for such Holder's full amount of a General Unsecured Claim – no partial elections will be permitted.

7.6     **Restructured Notes Documents; New Convertible Notes**.

On the Effective Date, the Reorganized Debtors shall issue the Restructured Notes and the New Convertible Notes on the terms set forth in the Plan and the Restructuring Support Agreement. Confirmation of the Plan shall be deemed approval of the Restructured Notes and the other Restructured Notes Documents and the New Convertible Notes (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). On and as of the Effective Date, the Reorganized Debtors are authorized and directed to execute and deliver: (a) the Restructured Notes and the other Restructured Notes Documents to the applicable Consenting Secured Noteholder; and (b) the New Convertible Notes to each New Notes Creditor, who shall be deemed bound thereby, without the need for execution thereof by any Consenting Secured Noteholder  or New Notes Creditor, as applicable.

7.7     **New Equity**.

On and after the Effective Date, Reorganized CCM is authorized to issue, or cause to be issued, and shall issue the New Equity in accordance with the terms of the Plan and Restructuring Support Agreement without the need for any further corporate, limited liability company, or shareholder action (or action of any other party, including, without limitation, securityholders, members, limited or general partners, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable). All of the New Equity distributable under the Plan, shall be duly authorized, validly issued, and fully paid and non-assessable.

7.8     **Exemption from Registration Requirements**.

All shares of New Equity issued and distributed pursuant to the Plan will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) an exemption from such registration requirements under section 1145 of the Bankruptcy Code; (ii) an exemption from such registration requirements under section 4(a)(2) of the Securities Act (or Regulation D promulgated thereunder); or (iii) an exemption from such

registration requirements in compliance with Regulation S under the Securities Act; or (iv) such other exemption as may be available from any applicable registration requirements.

To the extent that the offering, issuance, and distribution of any shares of New Equity pursuant to the Plan is in reliance upon section 1145 of the Bankruptcy Code, it is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of the New Equity. Such shares of New Equity to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) subject to the terms of the New Organizational Documents, will be freely tradable and transferable by any initial recipient thereof that (a) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Equity issued pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder under the Securities Act, or such other exemption as may be available from any applicable registration requirements. All shares of New Equity issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The New Common Equity underlying the MIP will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The New Convertible Notes issued and distributed pursuant to the Plan to applicable Holders of Post-Closing Claims or General Unsecured Claims, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) an exemption from such registration requirements under section 4(a)(2) of the Securities Act; (ii) an exemption from such registration requirements under Regulation S under the Securities Act; or (iii) such other exemptions as may be available from any applicable registration requirements. Section 4(a)(2) of the Securities Act provides that the offering or issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act. Regulation S provides that the offering or issuance of securities in an offshore transaction (as defined in Section 902(h) of Regulation S under the Securities Act) to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

The New Convertible Notes issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation S will be considered "restricted securities" (and, if applicable, any applicable restrictions on transfer set forth in Regulation S

under the Securities Act) and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom (such as Rule 144A or Regulation S) and in compliance with any applicable state or foreign securities laws.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

7.9     **Management Incentive Plan**.

On or after the Effective Date, the New Board shall be authorized to adopt and institute the MIP, enact and enter into related policies and agreements, and distribute New Common Equity to participants.

7.10     **Effectuating Documents; Further Transactions**.

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the Restructured Notes and the other Restructured Notes Documents, the New Convertible Notes, and any New Organizational Documents of the Reorganized Debtors in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

7.11     **Vesting of Assets in the Reorganized Debtors**.

Except as provided elsewhere in the Plan, the Plan Supplement, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Debtors' Estates (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, or the New Organizational Documents.

7.12     **Release of Liens, Claims, and Existing Equity Interests**.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable Distributions made pursuant to the Plan, all Liens, Claims or Existing Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished

and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Existing Equity Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, surrender, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim or Allowed 2023 Bridge Noteholder Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim or Allowed 2023 Bridge Noteholder Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim or Allowed 2023 Bridge Noteholder Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens *or lis pendens* and take any and all other steps reasonably requested by the Debtors or the Reorganized Debtors that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim or 2023 Bridge Noteholder Claim.

On the Effective Date, in exchange for the treatment described herein and as set forth in Section 3.3 hereof, the 2023 Bridge Noteholder Claims shall be discharged, the Liens on the Collateral (as defined in each of the 2023 Bridge Notes and/or the First Lien Intercreditor Agreement) shall be released and the 2023 Bridge Notes shall be cancelled and be of no further force or effect.

7.13    **Cancellation of Stock, Certificates, Instruments and Agreements**.

On the Effective Date, except as provided below, all stock, units, instruments, certificates, agreements and other documents evidencing the Existing Equity Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

7.14    **Preservation and Maintenance of Debtors' Causes of Action**.

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal, including in an adversary proceeding filed in these Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The

Reorganized Debtors or their respective successor(s) may pursue such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successor(s) who hold such rights.

Unless a Cause of Action against a Holder of a Claim or an Existing Equity Interest or other Entity is (i) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, or (ii) subject to the discharge and injunction provisions in Article VIII of the Plan, and the Confirmation Order, in the case of each of clauses (i) and (ii), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

### 7.15    Exemption from Certain Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to the Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, UCC filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the following instruments or other documents without the payment of any such tax or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies to (i) the creation of any mortgage, deed of trust, Lien or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any Restructuring Transaction; (iv) the issuance, distribution and/or sale of any of the New Equity and any other securities of the Debtor or the Reorganized Debtor; or (v) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

### 7.16    Certain Tax Matters.

The Debtors and the Consenting Secured Noteholders will work together in good faith to structure and implement the Restructuring Transactions and the transactions related thereto in a tax-efficient and advantageous structure.

7.17    **Distributions**.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan (if any) will be paid from the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

7.18    **Creditors' Committee**.

On the Effective Date, any Committee, to the extent then in existence, will be deemed dissolved and cease to exist.  The dissolution of the Committee as provided herein shall not prevent any Professional from filing a Professional Fee Claim for service provided to the Committee prior to the Effective Date.

7.19    **Closing the Chapter 11 Cases**.

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of CCM, shall be closed pursuant to a separate order to be submitted under certification of counsel with the U.S. Trustee, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of CCM.  When all or substantially all of remaining Cash has been distributed in accordance with the Plan, the Reorganized CCM or Distribution Agent shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of CCM in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VIII**
**EFFECTS OF CONFIRMATION**

8.1    **Binding Effect**.

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EXISTING EQUITY INTERESTS IN THE DEBTORS, AND EACH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR EXISTING EQUITY INTEREST IN THESE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

8.2    **Discharge of Claims and Termination of Existing Equity Interests; Compromise and Settlement of Claims, Existing Equity Interests, and Controversies**.

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights,

and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Existing Equity Interests and Claims (other than any Intercompany Interests or Claims that are Reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Interest has accepted the Plan. Except as otherwise provided herein (and unless a Court of competent jurisdiction otherwise determines that a default is incurable), any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Intercompany Interests or Claims that are Reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, nothing in this Section 8.2 shall affect the rights of Holders of Claims to seek to enforce the Plan, including the Distributions to which Holders of Allowed Claims are entitled under the Plan. In consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Existing Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Existing Equity Interest may have with respect to any Allowed Claim or Allowed Existing Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Existing Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Existing Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Existing Equity Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Reorganized Debtors may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities

8.3     **Releases by the Debtors**.

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by Law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all claims, Causes of Action (including Avoidance Actions), and any**

61

other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, or the Definitive Documents; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Existing Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, the Magnetar Notes, the 2023 Bridge Notes, the Mezzanine Notes, the Secured Convertible Notes, the DIP Bridge Loan, the DIP Facility, the Exit Financing, the Restructured Notes and the Restructured Notes Documents, the New Convertible Notes, the New Equity, the New Organizational Documents, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Existing Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Interest of the Debtors or the Reorganized Debtors; and/or (vii) the Confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim Interest) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not (i) operate to waive or release any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party; (ii) be construed to limit any Reorganized Debtor's ability to pursue the D&O Liability Insurance Policies; and/or (iii) operate to waive or release the rights of such Debtor Releasing Party or the Reorganized Debtors to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.

Notwithstanding the foregoing, nothing in this Section 8.3 shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or

liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein.

       8.4     **Third Party Release**.

       **Notwithstanding anything contained in the Plan or the Restructuring Support Agreement to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable Law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third-Party Release") from any and all Claims, Interests, Causes of Action (including Avoidance Actions), and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions among the Debtors, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, or the Definitive Documents; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, the Magnetar Notes, the 2023 Bridge Notes, the Mezzanine Notes, the Secured Convertible Notes, the DIP Bridge Loan, the DIP Facility, the Exit Financing, the Restructured Notes and the Restructured Notes Documents, the New Convertible Notes, the New Equity, the New Organizational Documents, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or**

rescission of the purchase or sale of any Interest of the Debtors or the Reorganized Debtors; and/or (vii) the Confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; **provided, however, that the foregoing provisions of this Third-Party Release shall not (i) operate to waive or release any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party; (ii) be construed to limit the Reorganized Debtors' ability to pursue the D&O Liability Insurance Policies; (iii) waive or release the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; and/or (iv) waive or release any rights of the Consenting Secured Noteholders with respect to the Restructured Notes and the Restructured Note Documents, in each case with respect to any rights or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement, in each case that they may have under such agreements that survive termination of such agreements against any entity that is not a Debtor or a Reorganized Debtor, and otherwise in accordance with the terms of this Plan, which rights are excluded from the Third-Party Release and shall be preserved in all respects.**

**The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.**

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein. Each Releasing Party shall retain all of its rights and remedies with respect to any non-Debtor that is not a Released Party pursuant to this Section 8.4 notwithstanding the discharge of its Allowed Claims and/or Interests hereunder or its acceptance or receipt of the Distributions set forth herein.

8.5     **Exculpation**.

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, or the solicitation of votes for, or Confirmation of, this

Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities or Interests under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security or Interest of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable the Definitive Documents, the DIP Facility, the Exit Financing, the Restructured Notes and the Restructured Notes Documents, the New Convertible Notes, the New Equity, the New Organizational Documents, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of this Plan; provided, however, that the foregoing provisions of this Exculpation shall not: (i) operate to waive or release any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party; and/or (ii) operate to waive or release the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy Law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Section 8.5 shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and Distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such Distributions made pursuant to this Plan.

8.6     **Injunction**.

**Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to Exculpation pursuant to Section 8.5, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties,**

**or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests unless such setoff was formally asserted in a timely Filed Proof of Claim or such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated or settled pursuant to the Plan.**

8.7    **Setoffs and Recoupment**.

Except as otherwise provided herein or in the Plan Supplement, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor, of any such claims, rights, and Causes of Action. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Causes of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary herein, nothing in this Plan or the Confirmation Order shall modify the rights of the Debtors, the Reorganized Debtors, or any current or former counterparty to an Executory Contract or Unexpired Lease with the Debtors, as applicable, to assert any right of setoff or recoupment, if any, that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the ability to (a) setoff or recoup a security deposit, if any, held pursuant to the terms of an Unexpired Lease or Executory Contract, as applicable, (b) assert rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (c) assert rights of setoff or recoupment, if any, as a defense to any Claim or Causes of Action brought by the Debtors or Reorganized Debtors.

8.8     **Compromise, Settlement, and Release of Claims and Interests**.  As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interest of the Debtors and their Estates. Subject to Article X hereof, all distributions to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

8.9     **Release of Liens**.

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors (at the expense of the Debtors or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

8.10    **No Liability Pursuant to Section 1125(e) of the Bankruptcy Code**.

**Without in any way limiting the releases and exculpation set forth in Sections 8.3, 8.4, or 8.5 hereof, to the fullest extent permitted by section 1125(e) of the Bankruptcy Code, each of the 1125(e) Parties is hereby entitled to all of the protections and benefits afforded by section 1125(e) in connection with such party's solicitation and participation in relation to the Plan.**

8.11    **Terms of Injunctions or Stays**.  Unless otherwise provided in this Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until these Chapter 11 Cases are closed.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    **Debtors Assumption of Executory Contracts and Unexpired Leases**.

Except as otherwise provided in the Plan or in the Plan Supplement, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by such Debtor; (ii) expired or terminated pursuant to its own terms prior to the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date or (iv) is included on the Schedule of Rejected Contracts which may be amended from time to time by the Debtors to add or remove Executory Contracts and Unexpired Leases (such amendments to be filed and served on a further Plan Supplement from time to time), in which case such Executory Contracts and Unexpired Leases shall be deemed rejected on the Effective Date. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to one or more Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all

68

modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.3    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim. The Debtors or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (i) the amount of any Cure Claim, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

9.4    **Assumption of Insurance Policies**.

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such D&O Liability Insurance Policy shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

9.5    **Indemnification**.

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan. All such obligations are treated as and deemed to be Executory Contracts to be assumed by the Debtors pursuant to Section 9.1 of the Plan. Notwithstanding the foregoing, nothing shall impair the Reorganized Debtors from prospectively modifying any such indemnification provisions (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts or

otherwise) after the Effective Date, for indemnification claims and/or rights arising after the Effective Date.

9.6     **Severance Agreements and Compensation and Benefit Programs; Employment Agreements**.

Except as otherwise provided in the Plan, the Plan Supplement or any order of the Bankruptcy Court, all severance policies, all severance arrangements and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to their employees and retirees, including all savings plans, retirement plans, healthcare plans, disability plans, severance agreements and arrangements, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

9.7     **Workers' Compensation Benefits**.

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

9.8     **Reservation of Rights**.

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date or such other date the Reorganized Debtors deem appropriate.

**ARTICLE X**
**DISTRIBUTIONS**

10.1     **Distributions for Claims Allowed as of the Effective Date**.  Except as otherwise provided herein, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the

71

Effective Date shall be made pursuant to the terms and conditions of this Plan.  Notwithstanding any other provision of this Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely filed; or (iii) is evidenced by a Proof of Claim that has been amended by a subsequently filed Proof of Claim that purports to amend the prior Proof of Claim

10.2    **No Distributions on Disputed Claims**.  No Distribution shall be made by the Distribution Agent with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

10.3    **Distributions on Claims Allowed after the Effective Date**.  Payments and Distributions from the Distribution Agent to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims.  Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to such Holder any property that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under this Article X on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

10.4    **Objections to and Estimation of Claims**.  Unless otherwise provided in this Plan, after the Effective Date, the Reorganized Debtors shall have sole and exclusive standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors or the Reorganized Debtors, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.  Except as otherwise provided in this Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors or the Estates, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

10.5    **Election Procedures for Holders of General Unsecured Claims**.

To validly make a New Notes Election, a Holder of an Allowed General Unsecured Claim must, on or before the Voting  Deadline, complete and duly execute the election form (the "**Election Form**") included with its Ballot. The Election Form will require the Holder of Allowed General Unsecured Claim to provide the New Notes Certification as well as information to enable the New Convertible Notes to be issued to such Holder on the Effective Date. If a Holder of an

Allowed General Unsecured Claim does not make a New Notes Election by submitting a completed Election Form, such Holder shall receive the treatment in Class 8 of the Plan.

10.6 **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a) **Delivery of Distributions in General**.  Distributions to Holders of Allowed Claims shall be made at such Holder's Distribution Address.

Distributions shall be made from the Distribution Agent in accordance with the terms of this Plan.

In making Distributions under this Plan, the Distribution Agent may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b) **Undeliverable and Unclaimed Distributions**.  If the Distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Distribution Agent shall use reasonable efforts to determine such Creditor's then-current address.  Unclaimed Distributions shall be returned to the Distribution Agent until such Distributions are claimed.

(c) **Treatment of Unclaimed Distributions**.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the Distribution Agent, the Reorganized Debtors, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan.  Nothing contained in this Plan shall require the Debtors or the Distribution Agent to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in his / her sole discretion, the Distribution Agent may periodically publish notice of Unclaimed Distributions.

10.7 **Interest on Claims**.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

10.8 **Withholding and Reporting Requirements**. In connection with this Plan and all Distributions under this Plan, the Distribution Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements. The Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Distribution Agent, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such information is not received by the deadline established by the Distribution Agent and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Distribution Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Distribution Agent in connection with such Distribution. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Reorganized Debtors and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

10.9 **Miscellaneous Distribution Provisions**.

(a) **Method of Cash Distributions**. Any Cash payment to be made by the Reorganized Debtors pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Distribution Agent, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Distribution Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b) **Distributions on Non-Business Days**. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

10.10 ***De Minimis Distribution Provisions***. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100. Any such Distribution not made in accordance with the provisions of this Article X shall be retained by the Reorganized Debtors and invested as provided in this Plan. Any Distribution not made in accordance with this Article X to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

10.11 **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests. Neither the Reorganized Debtors nor the Distribution Agent will have any obligation to recognize the transfer or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

11.1 **Conditions to Effective Date**. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors in writing:

(a) the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

(b) the Definitive Documents have been executed and/or effectuated, shall be in form and substance materially consistent with the Restructuring Support Agreement, and any conditions precedent related thereto or contained therein, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

(c) the New Organizational Documents shall have been executed and/or effectuated and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

(d) the New Equity to be issued and/or delivered on the Effective Date shall have been validly issued by Reorganized CCM, shall be fully paid and non-assessable, and shall be free and clear of all taxes, liens or other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights (A) except for any restrictions on transfer as may be imposed by applicable securities Laws and (B) except as may be imposed by or set forth in the New Organizational Documents;

(e) the Reorganized Debtors will have cash on hand of at least $3,000,000.00 as measured by the liquidity covenant in Section 4.25 of the Magnetar Notes (as revised by the

Magnetar Notes Term Sheet) upon the Effective Date after giving effect to the Exit Financing and all Plan Distributions to be made upon the Effective Date;

(f)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(g)    there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other governmental unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(h)    none of these Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

(i)    no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

(j)    the Restructuring Transactions and all transactions contemplated herein shall have been consummated in a manner consistent in all respects with the Restructuring Support Agreement and the Definitive Documents.

11.2    **Substantial Consummation**.  "Substantial Consummation" of the Plan, as defined in sections 1101 and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

11.3    **Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order form the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court shall have entered an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## ARTICLE XII
## ADMINISTRATIVE PROVISIONS

12.1    **Retention of Jurisdiction**.  Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a)    To determine the allowability, classification, or priority of Claims upon objection of the Debtors, the Reorganized Debtors, the Distribution Agent, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)      To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Entity;

(c)      To protect the property of the Estates, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates;

(d)      To determine any and all applications for allowance of Professional Fee Claims;

(e)      To determine any Administrative Claims, Priority Tax Claims, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)      To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions hereunder;

(g)      To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease;

(h)      To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)      To enter one or more Final Orders closing the Debtors' Chapter 11 Cases;

(j)      To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)      To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)      To enable the Reorganized Debtors to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)     To determine any tax liability of the Debtors or the Reorganized Debtors pursuant to section 505 of the Bankruptcy Code, and to address any request by the Reorganized Debtors for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order, or the otherwise applicable Claims bar date, the hearing to consider approval of the Combined Disclosure Statement and Plan or the Confirmation Hearing;

(p)     To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these Chapter 11 Cases;

(q)     To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(r)     To hear and resolve Claims;

(s)     To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t)     To approve any Distributions, or objections thereto, under this Plan;

(u)     To approve any Claims settlement entered into or offset exercised by the Reorganized Debtors; and

(v)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

12.2    **Preservation of Exclusivity.**   By jointly proposing this Combined Disclosure Statement and Plan, the Debtors are not waiving their exclusive rights to file and solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code.

12.3    **Amendments**.

(a)     **Preconfirmation Amendment**.   The Debtors, in the exercise of their fiduciary duties, may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Combined Disclosure Statement and Plan, as modified, meet applicable Bankruptcy Code requirements.

(b)     **Postconfirmation Amendment Not Requiring Resolicitation**.   After the entry of the Confirmation Order, the Debtors may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that such modification shall

not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

        12.4    **Withdrawal of Plan**.  The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date in the exercise of their fiduciary duties or, if the Debtors are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

        12.5    **Successors and Assigns**.  The rights, benefits and obligations of any person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or Entity.

        12.6    **Governing Law**.  Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law.

        12.7    **Corporate Action**.  Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Reorganized Debtors, as the case may be.

        12.8    **Effectuating Documents and Further Transactions**.  The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as they deem necessary to effectuate and further evidence the terms and conditions of this Plan.

        12.9    **Confirmation Order and Plan Control**.  To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order (and any other orders of the Bankruptcy Court) controls over this Plan.

        12.10  **Notices**.  All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Debtors**:

        Conscious Content Media, Inc.
        121 Varick Street, 3rd Floor
        New York, NY 10010
        Attn: Neal Shenoy
        Email: neal@beginlearning.com

With copies to:

Reitler Kailas & Rosenblatt LLP
885 Third Avenue, 20th floor
New York, NY  10022
Attn:   Lauren Friend McKelvey
Email: lmckelvey@reitlerlaw.com

BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Attn: Daniel Brogan
Email:   dbrogan@bayardlaw.com


     12.11  **No Admissions or Waiver**.   Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

[Signature Page Follows]

## ARTICLE XIII
## RECOMMENDATION AND CONCLUSION

The Debtors believe that this Combined Disclosure Statement and Plan is in the best interests of the Estates and creditors and urge the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of this Combined Disclosure Statement and Plan.

**CONSCIOUS CONTENT MEDIA, INC.**

By:    */s/* Neal Shenoy
     Name:  Neal Shenoy
     Title:  Authorized Signatory

**KIDPASS, INC.**

By:    */s/* Neal Shenoy
     Name:  Neal Shenoy
     Title:  Authorized Signatory

**CODESPARK, INC.**

By:    */s/* Neal Shenoy
     Name:  Neal Shenoy
     Title:  Authorized Signatory

**LITTLE PASSPORTS, INC.**

By:    */s/* Neal Shenoy
     Name:  Neal Shenoy
     Title:  Authorized Signatory

**CCM MERGER SUB II, INC.**

By:    */s/* Neal Shenoy
     Name:  Neal Shenoy
     Title:  Authorized Signatory

**<u>Exhibit A</u>**

**New Convertible Note Term Sheet**

| | |
|---|---|
| **Instrument:** | Secured Promissory Note, convertible into New Preferred Equity as described herein |
| **Issuer:** | Reorganized CCM |
| **Holder:** | Each Holder of Post-Closing Notes; and<br>Each Holder of General Unsecured Claims who makes the New Notes Election |
| **Maturity Date:** | 4 years from current Maturity Date under Post-Closing Note; or<br>4 years from Effective Date of Plan for each Holder of General Unsecured Claims who makes the New Notes Election |
| **Principal:** | [___]% of principal balance of Holder's Post-Closing Note; or<br>[___]% of Allowed General Unsecured Claim |
| **Interest:** | 8% PIK interest rate |
| **Security:** | Fourth lien on accounts receivable and inventory |
| **Conversion:** | Principal and accrued interest is convertible at the option of the Holder into the next series of New Preferred Equity (e.g., Series B) (at the prevailing share price) issued after the series of New Preferred Equity (Series A) issued pursuant to the Plan |
| **Drag-Along:** | Amendment to the New Convertible Notes can be taken via a majority of the New Convertible Noteholders by amount |

**<u>Exhibit B</u>**

**Liquidation Analysis**

**Exhibit C**

**Valuation Analysis**

**<u>Exhibit D</u>**

**Financial Projections**

**<u>Exhibit E</u>**

**Restructuring Support Agreement**